ORDER
 

 SHOOB, Senior District Judge.
 

 This action is brought pursuant to section 505(a)(2) of the Federal Water Pollution Control Act, as amended, otherwise known as the Clean Water Act, 33 U.S.C. § 1251
 
 et seq.
 
 (CWA), and the Administrative Procedure Act, 5 U.S.C. § 701
 
 et seq.
 
 (APA). Plaintiffs are environmental organizations seeking to compel the United States Environmental Protection Agency (EPA) to implement certain provisions of the Clean Water Act in Georgia that require EPA to identify environmentally impaired waters known as water quality limited segments (WQLSs) and to establish total maximum daily loads (TMDLs) of pollutants for the water quality limited segments to achieve the Clean Water Act’s water quality standards.
 

 The parties have filed cross-motions for summary judgment. The Court has thoroughly reviewed the record and conducted oral arguments. The undisputed facts show that Georgia has hundreds of heavily polluted waters that do not attain applicable water
 
 *867
 
 quality standards. Despite this fact, Georgia has faded for over sixteen years to comply with the Clean Water Act’s requirement that states identify total maximum daily loads of pollutants in waters that do not attain applicable standards. At its current pace, Georgia will take more than one hundred years to comply with the Clean Water Act. The Court concludes that EPA’s approval of Georgia’s totally inadequate TMDL submissions and schedule for submission of TMDLs is arbitrary and capricious in violation of the Administrative Procedures Act and, therefore, plaintiffs are entitled to summary judgment on the total maximum daily load issue. On the water quality limited segment issue, the Court denies both parties’ motions for summary judgment because the Court concludes that there is a genuine issue of material fact as to whether EPA’s approval of Georgia’s 1994 WQLS list was arbitrary and capricious in violation of the Administrative Procedures Act.
 

 Clean Water Act
 

 The Clean Water Act was passed in 1972 to “ ‘restore and maintain the chemical, physical and biological integrity of the nation’s waters.’ ” 33 U.S.C. § 1251. The Clean Water Act focuses on two potential sources of pollution: point sources and nonpoint sources. A point source is “any discernible, confined, and discrete conveyance,” including pipes, ditches, conduits, or vessels “from which pollutants are or may be discharged.” 33 U.S.C. § 1362(14). A non-point source of pollution is any non-discrete source, such as runoff from agriculture, forestry, and construction activity.
 

 Point source pollution is subject to technology-based controls imposed by the National Pollution Discharge Elimination System (NPDES) permit process, which sets quantitative limits on the amount of pollutants released from each point source. Under authority of the CWA, EPA has delegated its duties to establish and administer the NPDES permit program to Georgia, which operates the program through the Department of Natural Resources/Environmental Protection Division (EPD). 33 U.S.C. § 1342(b). Where those controls are insufficient to clean up water bodies, the CWA mandates use of a water quality based approach. 33 U.S.C. § 1313(d).
 

 Under the Act’s water quality based approach, states must adopt water quality standards based on the uses of the waters and the amount of pollution that would impair the uses. 33 U.S.C. § 1313(a)-(c). Each state must then identify waters within its boundaries which do not meet these water quality standards. 33 U.S.C. § 1313(d)(1)(A). These waters are called “water quality limited segments” (WQLS). After identifying WQLSs, states must prioritize them based on the severity of the pollution and the uses of the waters.
 
 Id.
 
 States must then develop, in accordance with the priority ranking, a “total maximum daily load” (TMDL) for each pollutant impairing each WQLS. 33 U.S.C. § 1313(d)(1)(C).
 

 A TMDL sets the maximum amount of pollutants a water body can receive daily without violating the state’s water quality standards. 33 U.S.C. § 1313(d)(1)(C). A TMDL includes best estimates of pollution from nonpoint sources and natural background sources (called load allocations or LAs), pollution from point sources (called wasteload allocations or WLAs), and a margin of safety. 40 C.F.R. § 130.2(i). TMDLs must take into account seasonal variations. 33 U.S.C. § 1313(d)(1)(C).
 

 The process for WQLS identification and TMDL development is set out in § 303(d) of the Clean Water Act, which states:
 

 Each State shall submit to the Administrator from time to time, with the first such submission not later than [June 26, 1979], for his approval the [WQLSs identified and the TMDLs established]. The Administrator shall either approve or disapprove [the WQLSs and TMDLs] not later than thirty days after the date of submission---- If the Administrator disapproves [the WQLSs and the TMDLs], he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters ...
 

 
 *868
 
 33 U.S.C. § 1313(d). If a state fails to submit a WQLS list or TMDL determinations over a long period of time, this prolonged failure may amount to the ‘constructive submission’ by that state of no WQLS list or TMDLs, thus triggering EPA’s mandatory duty to approve or disapprove of the constructive submissions and, upon disapproval, to promulgate a WQLS list or TMDL determinations.
 
 See Scott v. City of Hammond,
 
 741 F.2d 992 (7th Cir.1984).
 

 To aid in enforcement of the Clean Water Act, section 505(a) of the Act authorizes citizens to bring suit in federal court against EPA for failure to perform “any act or duty under this Act which is not discretionary with the Administrator.’’ 33 U.S.C. § 1365(a). “The Supreme Court has held that the CWA citizen suit provision allows a district court to ‘order the relief it considers necessary to secure prompt compliance with the Act.’ ”
 
 Alaska Center for the Env’t v. Reilly,
 
 796 F.Supp. 1374, 1376 (W.D.Wash. 1992)
 
 (citing Weinberger v. Romero-Barcelo,
 
 456 U.S. 305, 320, 102 S.Ct. 1798, 1807, 72 L.Ed.2d 91 (1982)).
 

 Georgia’s Response to the Clean Water Act Requirements
 

 The first submissions by all states to the EPA of WQLSs and TMDLs were due on June 26, 1979. 33 U.S.C. § 1313(d)(2);
 
 see Alaska Center for the Env’t v. Browner,
 
 20 F.3d 981, 983 n. 1 (9th Cir.1994). EPA recently adopted regulations requiring that WQLS lists and TMDL determinations are due on April 1 of every even numbered year. 40 C.F.R. § 130.7(d).
 

 It is undisputed that Georgia failed to submit a WQLS list to EPA until September 25, 1992, over thirteen years after the statutory due date. This list contained approximately 123 waters. EPA approved the list on November 24, 1992, after the 30 day statutory deadline for approval of § 303(d) submissions. Georgia submitted its 1994 WQLS list on August 10, 1994, after the April 1 deadline. On October 6, 1994, after the 30 day statutory deadline, EPA notified Georgia that the 1994 list must go through the public participation requirements. After submitting the list to public comment, Georgia resubmitted its WQLS list to EPA on May 10, 1995, which EPA approved on June 9, 1995. This list contains approximately 340 WQLSs.
 

 According to defendants, in addition to Waste Load Allocations developed and submitted to EPA as part of the NPDES permit program, Georgia has completed two TMDLs. The first TMDL, which was for dissolved oxygen in Line Creek located in Peachtree City, was submitted on December 14, 1994, approximately three months after this action was filed. EPA approved the Line Creek TMDL on January 11, 1995, within the thirty day statutory period to approve or disapprove § 303(d) submissions. Georgia submitted a second TMDL for dissolved oxygen in Big Flat Creek located in Loganville on August 4, 1995, approximately two months after plaintiffs filed their motion for summary judgment. EPA approved the Big Flat Creek TMDL on September 8,1995. Defendants also state that Georgia is working on TMDLs for West Point Lake and for the Chattahoochee River. Finally, defendants have attached to their response to plaintiff’s motion for summary judgment the affidavit of Alan M. Hallum, Chief of the Water Protection Branch of Georgia’s EPD, stating that Georgia promises eventually to develop two TMDLs for each of Georgia’s fourteen major river basins by the year 2005 through its River Basin Management Act program.
 

 Plaintiffs Allegations
 

 Plaintiffs allege that EPA has a mandatory duty under the Clean Water Act to develop a WQLS list for Georgia and to make TMDL determinations for those WQLSs because Georgia has failed to submit timely and adequate WQLS lists and TMDL determinations. Second, plaintiffs argue that EPA’s approval of Georgia’s submissions and its failure to promulgate its own WQLS list and TMDL determinations is arbitrary and capricious and constitutes agency action unreasonably delayed in violation of the APA. Plaintiffs seek to require EPA to: 1) establish a sufficient ambient water quality monitoring system to determine the full scope of the WQLSs in Georgia; 2) identify Georgia’s WQLSs; 3) prioritize the WQLSs; and 4) establish TMDLs for the WQLSs or, alterna
 
 *869
 
 tively, establish a schedule with Georgia for submission of TMDLs for all WQLSs.
 

 Standards of Review
 

 Plaintiffs and defendants move for summary judgment. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when “there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law.” In
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court held that the moving party could meet this burden by demonstrating that there is “an absence of evidence to support the non-moving party’s case.”
 
 Id.
 
 at 325, 106 S.Ct. at 2554. At that point, the burden shifts to the non-moving party to go beyond the pleadings and present specific evidence giving rise to a triable issue.
 
 Id.
 
 at 324, 106 S.Ct. at 2553. In reviewing motions for summary judgment, the Court must construe the evidence and all inferences drawn from the evidence in the light most favorable to the non-moving party.
 
 WSB-TV v. Lee,
 
 842 F.2d 1266, 1270 (11th Cir.1988).
 

 When reviewing agency action under the Administrative Procedure Act, “[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law____” 5 U.S.C. § 706(2)(A). Furthermore, the APA authorizes courts to “compel agency action unlawfully withheld or unreasonably delayed.” 5 U.S.C. § 706(1). “Agency action,” as used in section 706, “includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.” 5 U.S.C. § 551(13).
 

 The APA’s standard of review is narrow and presumes the agency action is valid,
 
 Ethyl Corp. v. EPA
 
 541 F.2d 1, 34 (D.C.Cir.),
 
 cert. denied,
 
 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976), but does not shield agency action from a “thorough, probing, in-depth review.”
 
 Citizens to Preserve Overton Park, Inc. v. Volpe,
 
 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The APA does not give a court power “to substitute its judgment for that of the agency,” but does allow the court to “consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.”
 
 Id.
 
 at 416, 91 S.Ct. at 823-24.
 

 A decision is “arbitrary and capricious” within the meaning of the APA if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.
 
 Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co.,
 
 463 U.S. 29, 44, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).
 

 Discussion
 

 1. Water Quality Limited Segments
 

 Georgia and EPA have clearly failed to comply with the time deadlines of the Clean Water Act. Georgia did not submit a WQLS list until September 25, 1992, over thirteen years after the June 26, 1979, deadline for first submissions, and EPA failed to approve or disapprove Georgia’s 1992 submission within thirty days, as required by the CWA. Furthermore, Georgia submitted its 1994 WQLS list after EPA’s April 1 deadline and EPA failed to approve or disapprove the list within thirty days of submission, as required by the Act. However, despite this delay, EPA did eventually approve Georgia’s 1994 WQLS list on June 9,1995.
 

 The parties vigorously dispute the adequacy of Georgia’s 1994 WQLS list. Plaintiffs argue that Georgia’s 1994 WQLS list did not include many waters identified by EPD as not attaining water quality standards because of nonpoint pollution (§ 319 waters and waters polluted by agriculture, forestry, and mining activities) as well as because of toxic pollution (§ 304(Z) waters). Plaintiffs further argue that the list excludes waters impacted by discharges from nuclear facilities and waters with fish consumption bans. Defendants respond that many of the disputed waters were not included on Georgia’s WQLS list because Georgia lacked water quality data or
 
 *870
 
 the waters were already subject to effluent limitations, or other individual control strategies, and therefore do not need to be listed.
 

 . The Clean Water Act requires states to identify those waters for which point source discharge permits required by the Act are not stringent enough to implement any water quality standard applicable to the waters. 33 U.S.C. § 1313(d)(1)(A). EPA regulations require identification only of those water quality limited segments still requiring TMDLs after application of point source discharge limitations
 
 and
 
 other pollution control requirements, such as best management practices, required by local, state, or federal authority. 40 C.F.R. § 130.7(b)(1).
 

 Defendants argue that EPA’s interpretation of the Clean Water Act “is based on its reasonable desire to focus its own and states’ TMDL resources on waters that could benefit from TMDLs.” According to defendants, “if standards are being attained or are reasonably expected to be attained through implementation of best management practices outside the context of a TMDL, there is no utility in identifying the water for TMDL development.” The Court is concerned, however, as to whether Georgia made any showing to EPA that the individual control strategies used to justify exclusion of waters from the WQLS list were enforceable and were causing the WQLSs to attain applicable water quality standards or were reasonably expected to lead to the attainment of water quality standards.
 

 The Court is also concerned with Georgia’s apparent failure to consider narrative standards as required by EPA regulations,
 
 see
 
 40 C.F.R. § 130.7(b)(3), when formulating its 1994 WQLS list. The Clean Water Act requires each state to “identify those waters within its boundaries for which the effluent limitations required by [the Act] are not stringent enough to implement any water quality standard applicable to such waters.” 33 U.S.C. § 1313(d)(1)(A). EPA regulations define “applicable water quality standards” to include “numeric criteria,
 
 narrative criteria,
 
 waterbody uses, and antidegradation requirements.” 40 C.F.R. § 130.7(b)(3) (emphasis added). Plaintiffs have provided evidence that Georgia has narrative water quality standards
 
 [1]
 
 and that Georgia did not consider these narrative standards in formulating its 1994 WQLS list.
 
 [2]
 
 Furthermore, Georgia’s 1994 WQLS list does not appear to include a consideration of narrative standards. Defendants have not responded to plaintiffs’ arguments regarding narrative standards. The Court finds, however, that the record is unclear as to what were the applicable narrative standards and whether these standards were considered by Georgia.
 

 The Court is further concerned about Georgia’s apparent failure to use “all existing readily available water quality-related data and information,” as required by EPA regulations, 40 C.F.R. § 130.7(b)(5), when formulating its 1994 WQLS list, such as Discharge Monitoring Reports, Quarterly Noncompliance Reports, and available EPA databases (“Biological Information Systems” and “Ocean Data Evaluation System”). The Court, however, cannot determine from the record whether Georgia’s failure to use this information resulted in the exclusion of waters that should have been listed.
 

 On the issue of monitoring, the Court concludes that EPA does not have a mandatory duty to monitor a state’s waters under the Clean Water Act. Therefore, defendants are entitled to summary judgment on Count 1. The Court, however, notes that monitoring may be an appropriate equitable remedy if plaintiffs prevail on the WQLS issue. Fur
 
 *871
 
 thermore, Georgia’s undisputed failure to monitor or evaluate over ninety percent of its waters, in light of EPA regulations requiring monitoring, 40 C.F.R. § 130.4, is relevant to the Court’s consideration of whether EPA’s approval of Georgia’s WQLS list was arbitrary and capricious.
 

 The record, as it stands, is insufficient for the court to determine whether EPA’s approval of Georgia’s 1994 WQLS list of water quality limited segments was arbitrary and capricious. The Court concludes that there is a genuine issue of material fact as to this issue to be resolved at trial. Therefore, the Court denies both plaintiffs’ and defendants’ motions for summary judgment.
 

 2.
 
 Total Maximum Daily Loads
 

 Georgia clearly has not complied with the TMDL requirements of the Clean Water Act. The CWA requires states to submit TMDLs for all WQLSs. 33 U.S.C. § 1313(d)(1)(A), (C). In over sixteen years since Georgia’s first TMDL submissions were due, Georgia has developed only two TMDLs, both submitted after the filing of this action. Furthermore, after reviewing these TMDLs, the Court concludes that they clearly do not satisfy the requirements of § 303(d) because they do not provide daily limits for priority pollutants on identified WQLSs.
 
 [3]
 
 Furthermore, Georgia’s WLAs are not TMDLs because they are not daily loads, they are not for WQLSs, and they do not account for seasonal variations as required by CWA. 33 U.S.C. § 1313(d)(1)(C).
 
 [4]
 
 Finally, Georgia has no current plans to develop TMDLs for all WQLSs as required by CWA. Defendants state that Georgia has promised to develop approximately 25 complex TMDLs for its major river basins within the next eight years. At this pace, Georgia will take over a hundred years to complete TMDLs for the approximately 340 WQLSs identified on the 1994 WQLS list.
 
 [5]
 

 The tight deadlines for submission of TMDLs demonstrate a congressional intent that TMDLs be established promptly.
 

 While these tight deadlines might mean that initially established TMDLs would be based on less than ideal data, that fact alone was considered and addressed by Congress, as demonstrated by the statutory direction to use ‘a margin, of safety which takes into account any lack of knowledge.’
 
 Id.
 
 § 1313(d)(1)(C). As expressed by one EPA employee, ‘In other words, Congress says ignorance is no excuse for inaction. Just add a margin of safety to compensate for the lack of knowledge and keep moving.’
 
 ACE,
 
 762 F.Supp. at 1429 (quoting Thomas Wilson, Chief of the Office of Water Planning, EPA Region X, EPA Nonpoint Source News-Notes, October 1990, at 20).
 

 Natural Resources Defense Council, Inc. v. Jeanne Fox et al,
 
 909 F.Supp. 153 (PEL) (S.D.N.Y.1995). Georgia’s submissions clearly fail CWA’s requirement that states promptly identify TMDLs for all WQLSs.
 

 The statutory framework of the CWA granted EPA an oversight function to ensure that states fulfill their statutory duties. While the Court acknowledges that the Clean Water Act places “primary reliance for developing water quality standards on the states,”
 
 Scott,
 
 741 F.2d at 994, the Court believes that the Act requires EPA to step in when states fail to fulfill their duties under the Act.
 
 See Alaska Ctr. for the Env’t v. Reilly,
 
 762 F.Supp. 1422, 1429 (W.D.Wash.
 
 *872
 
 1991) (“Section 303(d) expressly requires the EPA to step into the states’ shoes if their TMDL submissions or lists of water quality limited segments are inadequate”). The Court finds that EPA’s failure to disapprove of Georgia’s inadequate TMDL submissions was arbitrary and capricious in violation of the Administrative Procedure Act
 
 [6]
 
 and that EPA’s failure to promulgate TMDLs for Georgia violates the Clean Water Act.
 
 [7]
 
 Therefore, the Court grants summary judgment in favor of plaintiffs on their TMDL claim.
 

 Summary
 

 The Court GRANTED plaintiffs motion for oral arguments, which were held on February 29, 1996, at 9:30 a.m. [# 16-1]; GRANTS IN PART AND DENIES IN PART plaintiffs’ motion for summary judgment [# 13-1]; GRANTS IN PART AND DENIES IN PART defendants’ motion for summary judgment [# 23-1]; and DIRECTS the parties to submit briefs of not more than fifteen pages within thirty days of the date of entry of this order as to the appropriate remedy on the TMDL violation. The trial on the WQLS issue is scheduled for Monday, May 13, 1996, at 9:30 a.m. The Court DIRECTS the parties to submit a Consolidated Pretrial Order within thirty days of the date of entry of this order. The parties shall submit proposed findings of fact and conclusions of law on the morning of the first day of trial. Local Rule 235-4(b)(25), N.D.Ga.
 

 [1]
 

 . Georgia Department of Natural Resources, Environmental Protection Division, Rules and Regulations for Water Quality Control, Chapter 391-3-6, Revised May 29, 1994, at 7
 
 (see
 
 Plaintiffs' Exhibit 5 attached to Plaintiffs’ Brief in Reply to Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and Plaintiffs’ Brief in Opposition to Defendants’ Motion for Summary Judgment). For example, subsection (c) of the regulations states that "[a]ll waters shall be free from material related to municipal, industrial or other discharges which produce turbidity, color, odor or other objectionable conditions which interfere with legitimate water uses.”
 

 [2]
 

 . Deposition of William Moyers Winn, III, at 49-50.
 

 [3]
 

 . For the 1992 § 303(d) list, EPD listed its number one priority as low dissolved oxygen below major reservoirs. Line Creek was identified on Georgia’s 1992 § 303(d) list as a WQLS for dissolved oxygen, but was not below a major reservoir. Big Flat Creek was not identified as an active WQLS on Georgia's 1992 or 1994 § 303(d) lists.
 

 [4]
 

 . Defendants argue that a WLA is the functional equivalent of a TMDL when pollution from non-point source and natural background is insignificant, such as in low-flow conditions, which occur during extended periods of little or no rainfall. According to defendants, the CWA gives states leeway to establish priorities when developing TMDLs and Georgia’s decision to focus on dissolved oxygen TMDLs during low-flow conditions is reasonable. To the contrary, § 303(d) explicitly requires TMDLs to account for seasonal variations. 33 U.S.C. § 1313(d)(1)(C).
 

 [5]
 

 . The Court notes that defendants have admitted that Georgia’s 1994 WQLS list does not contain all WQLSs in Georgia.
 
 See
 
 EPA Adm. no. 47; EPA Response to Facts no. 47. The completion of TMDLs for all WQLSs once identified could take much longer than one hundred years.
 

 [6]
 

 . The Court does not find the constructive submission analysis to be appropriate for this case because Georgia has made
 
 some
 
 TMDL submissions, albeit totally inadequate.
 

 [7]
 

 . The Court declines to rule on Count V of plaintiff's complaint, which seeks to require EPA to establish a schedule for submission of TMDLs by Georgia, because the Court believes that this claim goes to the issue of what is the appropriate remedy in this case, which the Court will determine after full briefing by the parties.