SAN FRANCISCO BAYKEEPER; California Public Interest Research Group, Inc.; San Diego BayKeeper, Inc.; Environmental Defense Center, Plaintiffs–Appellants,

and

Natural Resources Defense Council; Santa Monica BayKeeper, Inc.; Western States Petroleum Association; Industrial Environmental Association of San Diego; Building Industry Legal Defense Foundation; California Building Industry Association, Intervenors,

v.

Christine Todd WHITMAN, Administrator of EPA, in her official capacity; Felicia Marcus, Regional Administrator; United States Environmental Protection Agency, Defendants–Appellees.

No. 01–16111.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 11, 2002.

Filed July 17, 2002.

Michael R. Lozeau, Earthjustice Legal Defense Fund, Stanford, CA, for the plaintiffs-appellants.

David S. Beckman, Natural Resources Defense Council, Los Angeles, CA; Margaret Rosegay, Pillsbury Winthrop LLP, San Francisco, CA; Steven P. McDonald, Luce, Forward, Hamilton & Scripps LLP, San Diego, CA, for the intervenors.

Sandra Slack Glover, United States Department of Justice, Washington, DC, for the defendants-appellees.

Before HUG, CUDAHY,* and TASHIMA, Circuit Judges.

## ORDER AND OPINION

HUG, Circuit Judge.

### ORDER

The Opinion filed on April 15, 2002, and reported at 287 F.3d 764, is withdrawn and the opinion attached to this order shall be filed in its place. With the filing of the opinion, the panel unanimously votes to deny the petition for rehearing. Judge

---

* Honorable Richard D. Cudahy, Senior United States Circuit Judge for the Seventh Circuit,

Tashima votes to deny the petition for rehearing en banc and Judges Hug and Cudahy so recommend.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on en banc rehearing. Fed. R.App. P. 35(b).

### OPINION

San Francisco BayKeeper, an environmental group, filed this action under the Clean Water Act ("CWA"), 33 U.S.C. § 1365(b), seeking a declaration that the State of California had failed to implement an adequate water pollution control program and failed to establish total maximum daily loads ("TMDL") of pollutants which could be introduced into polluted waters. BayKeeper contended that California was years behind in implementing a TMDL program, and consequently the U.S. Environmental Protection Agency ("EPA") had a non-discretionary duty to establish water pollution standards for California because the State had failed to make the required submissions. BayKeeper appeals the district court's dismissal of this claim on partial summary judgment, certified pursuant to Fed. R.Civ.P. 54(b). BayKeeper also challenges the district court's reliance on the EPA's Program Review document. We affirm.

### I. BACKGROUND

#### A. Statutory Background

In 1972, Congress passed the Clean Water Act ("CWA" or "Act") to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. In order to attain this objective, Congress sought to eliminate the

sitting by designation.

discharge of pollutants into the navigable waters by 1985. *Id.*

The Act focuses on two possible sources of pollution: point sources and nonpoint sources. Congress dealt with the problem of point source pollution using the National Pollution Discharge Elimination System ("NPDES") permit process. Under this approach, compliance rests on technology-based controls that limit the discharge of pollutants from any point source into certain waters unless that discharge complies with the Act's specific requirements. 33 U.S.C. §§ 1311(a), 1362(12).

When the NPDES system fails to adequately clean up certain rivers, streams or smaller water segments, the Act requires use of a water-quality based approach. States are required to identify such waters, which are to be designated as "water quality limited segments" ("WQLS"). The states must then rank these waters in order of priority, and based on that ranking, calculate levels of permissible pollution called "total maximum daily loads" or "TMDLs." 33 U.S.C. §§ 1313(d)(1)(A), (C). TMDLs are the maximum quantity of a pollutant the water body can receive on a daily basis without violating the water quality standard. The TMDL calculations are to ensure that the cumulative impacts of multiple point source discharges and nonpoint source pollution are accounted for. States may then institute whatever additional cleanup actions are necessary, which can include further controls on point and nonpoint pollution sources.

Under the Act, states are required to submit lists of WQLSs and TMDLs to the EPA at certain times; the first such submission was due by June 26, 1979. Sec. 303(d), 33 U.S.C. § 1313(d)(2).[1] Once a state makes the required submission, certain mandatory duties by EPA are trig-

gered. Within 30 days, EPA must review the state's submissions. If approved by EPA, the submissions are incorporated by the state into its continuing planning process established under § 1313(e)(3). If EPA does not approve the submission, however, the EPA has 30 days after disapproval to make its own identification of waters and establish TMDLs necessary to implement the applicable water quality standards. 33 U.S.C. § 1313(d)(2). The Act is silent as to the nature of EPA's obligations if a state, such as California here, fails to make any initial submission at all.

### B. California's TMDL Program

As this is a review of summary judgment, we must construe the facts in the light most favorable to BayKeeper, the non-moving party in this case. BayKeeper contends that California did not submit any TMDLs until 1994, which was over 15 years after the initial deadline for making a submission pursuant to § 303(d) of the Act.

Since that time, however, California has dedicated substantial resources to the development of its TMDL program. According to the May 2000 report of the EPA on California's TMDL Program Review, the state has completed more than 46 TMDLs for waters on California's lists. In addition, the report demonstrates that California has established a schedule for completing all TMDLs for waters on its 1998 § 303(d) lists within the next 12 years. Finally, the state has dedicated substantial resources to its TMDL program, allotting $7 million annually to TMDL funding.

### II. STANDARDS OF REVIEW

■ This Court reviews a grant of summary judgment de novo. *Weiner v. San*

---

1. Since the EPA published its identification of suitable pollutants in December, 1978, states' first submissions were due 180 days later, or June, 1979.

*Diego County,* 210 F.3d 1025, 1028 (9th Cir.2000). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Far Out Prods., Inc. v. Oskar,* 247 F.3d 986, 992 (9th Cir.2001). This Court reviews a district court's decision to consider a particular piece of evidence for abuse of discretion. *Northcoast Envtl. Ctr. v. Glickman,* 136 F.3d 660, 665 (9th Cir.1998).

## III. DISCUSSION

### A. Clean Water Act

BayKeeper argues that California's failings under the CWA have triggered a duty on the part of the EPA to establish TMDLs for the entire state. In order to prevail on this claim, BayKeeper must prove that EPA has a nondiscretionary duty to establish TMDLs for the State of California. *See* 33 U.S.C. § 1365(a)(2) (limiting citizen-suits against EPA to suits alleging EPA has failed to perform a duty "which is not discretionary"). In attempting to prove such a duty, BayKeeper relies upon § 303(d) of the CWA. That section reads as follows:

> Each State shall submit to the Administrator from time to time, with the first such submission not later than one hundred and eighty days after the date of publication of the first identification of pollutants under section 1314(a)(2)(D) of this title, for his approval the waters identified and the loads established under paragraphs (1)(A), (1)(B), (1)(C), and (1)(D) of this subsection. *The Administrator shall either approve or disapprove such identification and load not later than thirty days after the date of submission. If the Administrator approves such identification and load, such State shall incorporate them into*

*its current plan under subsection (e) of this section. If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon such identification and establishment the State shall incorporate them into its current plan under subsection (e) of this section.*

33 U.S.C. § 1313(d)(2) (emphasis added).

BayKeeper argues that EPA's duty under this statute has been triggered by both California's failure to submit a TMDL between 1980 and 1994 and EPA's failure to disapprove of several of California's § 303(d) submissions. We find these arguments unpersuasive.

### 1. California's Submission of TMDLs

■ The district court, in construing § 303(d) of the CWA, noted that the statute only requires the EPA to act if it *disapproves* of a state's TMDL submission. BayKeeper, however, argues that this same duty is also invoked when a state either fails to submit or submits an inadequate TMDL listing. Although not a novel issue, it is one that nonetheless has received little attention within this Court. However, we note that other courts faced with this same issue have dealt with it using what has been termed the "constructive submission" doctrine. Under this doctrine, a complete failure by a state to submit TMDLs will be construed as a constructive submission of no TMDLs, which in turn triggers the EPA's nondiscretionary duty to act.

The first case to employ this doctrine was the Seventh Circuit's decision in *Scott v. City of Hammond,* 741 F.2d 992 (7th

Cir.1984). *Scott* was a citizen-suit against the EPA for failure to prescribe TMDLs for pollutants discharged into Lake Michigan, after Illinois and Indiana had failed to do so. *Id.* at 996–97. Because of the lengthy absence of any state submissions, the Seventh Circuit concluded that the EPA had an affirmative duty to treat the states' inactions as a "constructive submission," warranting the EPA's response under § 303(d)(2). *Id.* The court held,

> We believe that, if a state fails over a long period of time to submit proposed TMDL's, this prolonged failure may amount to the "constructive submission" by that state of no TMDL's. Our view of the case is quite simple, and tracks the statutory scheme set up by Congress.... The allegation of the complaint that no TMDL's are in place, coupled with the EPA's admission that the states have not made their submissions, raises the possibility that the states have determined that TMDL's for Lake Michigan are unnecessary.... [T]hen the EPA would be under a duty to either approve or disapprove the "submission."

*Id.*

The *Scott* court also reasoned that

> We cannot allow the states' refusal to act to defeat the intent of Congress that TMDL's be established promptly—in accordance with the timetable provided in the statute. In addition, to construe the relevant statute [any other way] would apparently render it wholly ineffective. There is, of course, a strong presumption against such a construction.

*Id.* at 998. However, the *Scott* court ultimately remanded the case to the district court instructing it "to proceed as if the states had submitted proposals of no TMDL's unless [there is] evidence indicating that the states are, or will soon be, in the process of submitting TMDL proposals." *Id.* at 997, n. 11.

In the present case, the district court interpreted *Scott* to stand for the proposition that the constructive submission doctrine is viable only when "the state fails to submit any TMDLs and has no plans to remedy this situation." Because California had submitted some TMDLS between 1994 and the present, the district court held that the constructive submission theory did not apply.

Indeed, the district court's ruling is consistent with how other circuits have interpreted and applied *Scott*. In *Hayes v. Whitman*, 264 F.3d 1017 (10th Cir.2001), the Tenth Circuit was confronted with a case that contained facts very similar to those in the present case. In *Hayes,* the court rejected the contention that the constructive submission theory applied in that case and thus held the EPA did not have a nondiscretionary duty to establish TMDLs for the state. *Id.* at 1022–24. Oklahoma had submitted a few TMDLs (between three and twenty-nine—although the plaintiffs claimed that none of the TMDLs met all applicable regulatory requirements), and had established a schedule to complete more than 1400 TMDLs by 2010. *Id.* at 1022. Based on these facts, the court held that the "necessarily [ ] narrow" constructive submission theory did not apply. *Id.* at 1024. According to the Tenth Circuit, "[i]t applies only when the state's actions clearly and unambiguously express a decision" not to submit TMDLs. *Id.* Because Oklahoma had submitted some TMDLs and was making progress on a schedule to complete its remaining TMDLs over a twelve-year period, the court could not find that the state had decided not to submit TMDLs. *Id.*

Other courts have reached a similar conclusion. *See Natural Resources Defense Council, Inc. v. Fox* ("*NRDC III*"), 93

F.Supp.2d 531, 540 (S.D.N.Y.2000) (constructive submission theory inapplicable because, during the pendency of the lawsuit, New York submitted some TMDLs, formulated a plan for finishing them, and "demonstrated its good-faith interest in collaborating with EPA to bring State's TMDL program to completion"); *Sierra Club, North Star Chapter v. Browner,* 843 F.Supp. 1304, 1314 (D.Minn.1993) (finding that constructive submission theory did not apply since Minnesota had "identified TMDLs that it believes should receive the highest priority, ... initiated work on developing those TMDLs, and [ ] implemented some TMDLs"); *Idaho Sportsmen's Coalition v. Browner,* 951 F.Supp. 962, 967–68 (W.D.Wash.1996) (finding constructive submission theory inapplicable where Idaho had established three TMDLs and proposed a schedule for completion of additional TMDLs); *Sierra Club v. Hankinson,* 939 F.Supp. 865, 872 n. 6 (N.D.Ga. 1996) (constructive submission theory inapplicable where state had submitted some, albeit inadequate TMDLs).[2] Even in *Scott,* the first case to address this issue, the Seventh Circuit remanded the case to the district court for a determination whether the state was in the process of submitting any TMDLs even though none had been submitted up until that point. 741 F.2d at 997, n. 11.

■ We agree with the Tenth Circuit's decision in *Hayes.* California has submitted at least eighteen TMDLs and has established a schedule for completing its remaining TMDLs. Under the constructive submission doctrine, then, these actions on the part of California preclude any finding that the state has "clearly and unambiguously" decided not to submit any TMDLS. *See Hayes,* 264 F.3d at 1024.

In so ruling, we make no determination on California's past efforts and whether those efforts complied with the TMDL program. Any declaration by this Court that EPA has been in violation of the CWA in the past would only serve as an advisory opinion because there is now no present controversy over past violations for which there is a remedy. *See NRDC III,* 93 F.Supp.2d at 536 ("Plaintiffs did not, and could not, acquire rights by virtue of EPA's past failings, and the Court cannot, accordingly provide any relief that goes beyond ensuring EPA's present compliance with statutory mandates"). Accordingly, as we must look only at EPA's present duty and whether it has been breached, we need not make a broad, generic determination of the point in time at which a state's inaction may be deemed a constructive submission.

### 2. EPA's Failure to Disapprove of California's § 303(d) Submissions.

■ From 1980 through 1991, California made several 303(d) submissions that listed WQLSs. However, as California did not include TMDLs in those submissions, BayKeeper argues that the submissions were incomplete and should have been disapproved by the EPA. We disagree.

Subsection 303(d)(1)(A) requires that each state identify those waters within its boundaries for which the effluent limitations required by the statute are not stringent enough to implement the water quality standard applicable to such waters. The state is to establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters. This identification

---

2. *Compare Alaska Ctr. for the Env't v. Reilly,* 762 F.Supp. 1422, 1425, 1429 (W.D.Wash. 1991) (finding of a constructive submission rested on the facts that Alaska had submitted no TMDLs whatsoever and showed no intention of preparing any in the future).

produces the WQLSs for the waters, sometimes referred to as the § 303(d) list.[3]

Subsection 303(d)(1)(C) provides that each state is to establish for the waters so identified and "in accordance with the priority ranking" the total maximum daily load for the designated pollutants.[4] Subsection 303(d)(2) provides that each state is to submit, to the Administrator "from time to time" for his approval, the waters identified (the WQLSs) and the loads established (the TMDLs).[5]

BayKeeper contends that the plain language of subsection 303(d)(2) requires that a TMDL be submitted simultaneously with

every submission of a WQLS, and thus the failure to submit TMDLs with the WQLSs that were submitted by the State of California constituted a constructive submission of no TMDLS that required EPA action.

Although the subsection does require the state to submit both WQLSs, identifying the polluted waters and TMDLs specifying the action to be taken, nothing in the statute requires that they be submitted simultaneously. Nor does the statute state or imply that a submission will be incomplete unless it contains both a WQLS and a corresponding TMDL.

3. Subsection 303(d)(1)(A), 33 U.S.C. § 1313(d)(1)(A), provides in full:

Each State shall submit to the Administrator from time to time, with the first such submission not later than one hundred and eighty days after the date of publication of the first identification of pollutants under section 1314(a)(2)(D) of this title, for his approval the waters identified and the loads established under paragraphs (1)(A), (1)(B), (1)(C), and (1)(D) of this subsection. The Administrator shall either approve or disapprove such identification and load not later than thirty days after the date of submission. If the Administrator approves such identification and load, such State shall incorporate *them* into its current plan under subsection (e) of this section. If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon such identification and establishment the State shall incorporate them into its current plan under subsection (e) of this section.

4. Subsection 303(d)(1)(C), 33 U.S.C. § 1313(d)(1)(C), provides in full:

Each State shall establish for the waters identified in paragraph (1)(A) of this subsection, and in accordance with the priority ranking, the total maximum daily load, for those pollutants which the Administrator identifies under section 1314(a)(2) of this title as suitable for such calculation. Such

load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality.

5. Subsection 303(d)(2), 33 U.S.C. § 1313(d)(2), provides in full:

Each State shall submit to the Administrator from time to time, with the first such submission not later than one hundred and eighty days after the date of publication of the first identification of pollutants under section 1314(a)(2)(D) of this title, for his approval the waters identified and the loads established under paragraphs (1)(A), (1)(B), (1)(C), and (1)(D) of this subsection. The Administrator shall either approve or disapprove such identification and load not later than thirty days after the date of submission. If the Administrator approves such identification and load, such State shall incorporate them into its current plan under subsection (e) of this section. If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon such identification and establishment the State shall incorporate them into its current plan under subsection (e) of this section.

The EPA has never interpreted the statute to require simultaneous submissions. *See e.g.,* 43 Fed. Reg. 60,664 (Dec. 28 1978) ("While EPA encourages the establishment of TMDLs at the earliest date practicable, calculation of TMDLs will be an evolving and time consuming process which does not lend itself to imposition of a deadline date"). In addition, while EPA regulations have defined the "from time to time" language of 303(d) to require the submission of WQLS lists every two years, the EPA has not set a schedule for TMDL development. *See* 40 C.F.R. § 130.7(d)(1). EPA has issued guidelines, however, suggesting that states allocate between eight and thirteen years from the time of initial listing to the development of TMDLs, in order of priority, for all waters within their borders. *See* Robert Perciasepe, *New Policies for Establishing and Implementing Total Maximum Daily Loads (TMDLs)* (Aug. 8, 1997) (available at *http://www.epa.gov/OWOW/tmdl/ratepace.html*).

■ In considering an agency's interpretation of the law it is charged with administering, this court follows the framework enunciated in *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Chevron "mandates that absent a clear expression of congressional intent to the contrary, courts should defer to reasonable agency interpretations of ambiguous statutory language." *Friends of Cowlitz v. FERC,* 253 F.3d 1161 (9th Cir.2001); *see also, City of Seattle v. FERC,* 923 F.2d 713, 715 (9th Cir.1991) (court generally shows "great deference" to an agency's interpretation).

Here we find that the EPA's interpretation is reasonable. Under § 303(d), states are to develop a list of impaired waters (WQLSs) and rank those waters based on the severity of the pollution and uses to be made of those waters. 33 U.S.C. § 1313(d)(1)(A). A reasonable interpretation of the statute is that after the state has compiled that list, it must then establish TMDLs for those waters "in accordance with the priority ranking." *Id.* at § 1313(d)(1)(C). The development of TMDLs to correct the pollution is obviously a more intensive and time-consuming project than simply identifying the polluted waters, as the EPA has indicated. To interpret the subsection as a requirement of simultaneous submission of the list of polluted waters with the TMDL to correct each polluted water would render meaningless the provision that the TMDLs are to be established "in accordance with priority ranking" of the listed polluted waters.

Therefore, the EPA's duty under the CWA to establish TMDLs for the State of California has not been triggered either through constructive submission theory or the actual 303(d) submissions that did not list TMDLs.

### B. Administrative Procedures Act

■ Under § 706(1) of the APA, courts are authorized to "compel agency action ... unreasonably delayed." 5 U.S.C. § 706(1). As an alternative argument, BayKeeper argues that even if this Court finds that EPA did not have a duty under the CWA, "EPA's failure to assure the establishment of TMDLs on a timely basis nevertheless violates the APA's duty to avoid 'unreasonable delay.'" In advancing this argument, BayKeeper argues that an agency action may be unreasonably delayed even when the governing statute does not require action by a certain date. *See Forest Guardians v. Babbitt,* 164 F.3d 1261, 1272 (10th Cir.1998). However, for a claim of unreasonable delay to survive, the agency must have a statutory duty in the first place. *See Madison–Hughes v. Sha-*

*lala,* 80 F.3d 1121, 1124–25 (6th Cir.1996); *see also Brower v. Evans,* 257 F.3d 1058, 1067–68 (9th Cir.2001) (considering claim of unreasonable delay only after concluding that Secretary of Commerce had duty to act). As the previous section discussed, EPA does not presently have a statutory duty to act. Therefore, there can be no unreasonable delay in this case. *See NRDC III,* 93 F.Supp.2d at 544 ("As the Court finds that EPA is not presently under a duty to declare such a 'constructive submission,' it is illogical, and perhaps therefore unnecessary, to consider whether EPA unreasonably delayed such a declaration").

Accordingly, we affirm the district court's dismissal of BayKeeper's APA claim.

### C. Program Review Document

■ Finally, BayKeeper contends that the district court erred in relying upon the Program Review document, which Bay-Keeper describes as a "post-hoc staff memorandum" that attempts to "inflate the scope of the State's past and ongoing TMDL efforts in order to beef up EPA's arguments in this action." In support of this argument, BayKeeper points to *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), which held that "review [of an agency's decision] is to be based on the full administrative record" that was before the agency at the time the decision was made.

■ BayKeeper is correct that generally judicial review of agency action is based on a set administrative record. However, when a court considers a claim that an agency has *failed* to act in violation of a legal obligation, "review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." *Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 560 (9th Cir.2000); *see also Independence Min. Co., Inc. v. Babbitt,* 105 F.3d 502, 511 (9th Cir.1997) (noting that when a suit challenges agency inaction, district court can consider supplemental statements of an agency position because there is no date certain by which to define the administrative record). The reason for this rule is that when a court is asked to review agency inaction before the agency has made a final decision, there is often no official statement of the agency's justification for its actions or inactions.

As this case concerns agency inaction, there can be no final agency action that closes the administrative record or explains the agency's actions. Accordingly, it was not an abuse of discretion for the district court to rely upon the Program Review document.

### CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is AF-FIRMED.