[No. D043877. Fourth Dist., Div. One. Jan. 26, 2006.]

CITY OF ARCADIA et al., Plaintiffs and Appellants, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and
Appellants.

1394

COUNSEL

Rutan & Tucker, Richard Montevideo and Terence J. Gallagher for Plaintiffs and Appellants.

Downey Brand, Melissa A. Thorme; Lewis, Brisbois, Bisgaard, & Smith and B. Richard Marsh for County Sanitation Districts of Los Angeles County as Amicus Curiae on behalf of Plaintiffs and Appellants.

Demetriou, Del Guercio, Springer & Francis, Stephen A. Del Guercio, Michael A. Francis and Brian D. Langa for California Contract Cities Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Richards, Watson & Gershon and John J. Harris for The League of California Cities as Amicus Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Marilyn H. Levin and Gregory J. Newmark, Deputy Attorneys General, for Defendants and Appellants.

Law Office of Michael R. Lozeau, Michael R. Lozeau; and Dana P. Palmer for Santa Monica Baykeeper, Inc., Heal the Bay, Inc., and Natural Resources Defense Council, Inc., as Amici Curiae on behalf of Defendants and Appellants.

OPINION

McCONNELL, P. J.—This case concerns the serious environmental problem of litter discharged from municipal storm drains into the Los Angeles River, and efforts of the California Regional Water Quality Control Board, Los Angeles Region (Regional Board) and the State Water Resources Control Board (State Board)[1] to ameliorate the problem through the adoption and approval of a planning document setting a target of zero trash discharge within a multi-year implementation period.

The Water Boards appeal a judgment partially granting a petition for writ of mandate brought by the City of Arcadia and 21 other cities (Cities),[2] who

---

[1] We refer to these entities together as the Water Boards.

[2] In addition to Arcadia the Cities include Baldwin Park, Bellflower, Cerritos, Commerce, Diamond Bar, Downey, Irwindale, Lawndale, Monrovia, Montebello, Monterey Park, Pico Rivera, Rosemead, San Gabriel, Santa Fe Springs, Sierra Madre, Signal Hill, South Pasadena, Vernon, West Covina and Whittier.

agree trash pollution must be remedied but oppose the target of zero trash as unattainable and inordinately expensive. The Water Boards challenge the court's findings that an assimilative capacity study is a required element of its action; a cost-benefit analysis and consideration of economic factors are required under state law and are not met; the zero trash target is inapplicable to the Los Angeles River Estuary (Estuary) because it does not appear on the state's list of impaired waters; and, the Water Boards failed to comply with the California Environmental Quality Act (CEQA) by not preparing an environmental impact report (EIR) or its functional equivalent.

The Water Boards also contend the court erred by granting the Cities declaratory relief on their claim the trash total maximum daily load (TMDL) does not apply to "nonwaters," meaning areas that do not drain into navigable waters such as the Los Angeles River or tributaries, as the parties agreed during this proceeding that the trash TMDL applies only to navigable waters.

The Cities also appeal, contending the trial court erred by not invalidating the trash TMDL on the additional grounds the Water Boards failed to provide for deemed compliance with the target of zero trash through certain methods; failed to implement load allocations for nonpoint sources of trash pollution; failed to adhere to the data collection and analysis required by federal and state law; relied on nonexistent, illegal and irrational uses to be made of the Los Angeles River; and, violated the Administrative Procedures Act (APA).

We conclude the Cities' appeal lacks merit. As to the Water Boards' appeal, we conclude the court properly invalidated the planning document on the ground of noncompliance with CEQA, and we affirm the judgment insofar as it is based on that ground. We reverse the judgment to the extent it is based on other grounds. Further, we hold the court erred by granting declaratory relief on the nonwaters issue as there was no controversy when the court ruled.

## BACKGROUND INFORMATION

### I

### *Statutory and Regulatory Scheme*

The "quality of our nation's waters is governed by a 'complex statutory and regulatory scheme . . . that implicates both federal and state administrative responsibilities.' " (*City of Burbank v. State Water Resources Control Bd.*

(2005) 35 Cal.4th 613, 619 [26 Cal.Rptr.3d 304, 108 P.3d 862] (*City of Burbank*).) An overview of applicable law is required to place the facts here in context.

A

*Federal Law*

In 1972 Congress enacted amendments to the Federal Water Pollution Control Act (Pub.L. No. 92-500 (Oct. 18, 1972) 86 Stat. 816; 33 U.S.C. § 1251 et seq.), which, as amended in 1977, is commonly known as the Clean Water Act. (*City of Burbank, supra,* 35 Cal.4th at pp. 619–620.) Its stated goal is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by eliminating the discharge of pollutants into navigable waters. (33 U.S.C. § 1251(a).)

■ The Clean Water Act places "primary reliance for developing water quality standards on the states." (*Scott v. Hammond* (7th Cir. 1984) 741 F.2d 992, 994.) It requires each state to develop such standards and review them at least once every three years for required modifications. (33 U.S.C. § 1313(a), (c)(1).) The standards must include designated uses such as recreation, navigation or the propagation of fish, shellfish and wildlife; water quality criteria sufficient to protect the designated uses; and an antidegradation policy. (40 C.F.R. §§ 131.6, 131.10–131.12 (2003).) The water quality criteria "can be expressed in narrative form or in a numeric form, e.g., specific pollutant concentrations." (*Florida Public Interest Research Group v. E.P.A.* (11th Cir. 2004) 386 F.3d 1070, 1073.) "Narrative criteria are broad statements of desirable water quality goals in a water quality plan. For example, 'no toxic pollutants in toxic amounts' would be a narrative description." (*City of Burbank, supra,* 35 Cal.4th at p. 622, fn. 4.)

The Clean Water Act focuses on two possible sources of pollution: point sources and nonpoint sources. "Point source" means "any discernable, confined and discrete conveyance" such as a pipe, ditch, channel, tunnel, or conduit. (33 U.S.C. § 1362(14).) The Clean Water Act does not define nonpoint source pollution, but it has been described as " ' "nothing more [than] a [water] pollution problem not involving a discharge from a point source." ' " (*Defenders of Wildlife v. U.S. Environ. Protec.* (10th Cir. 2005) 415 F.3d 1121, 1124.)[3]

---

[3] According to the Environmental Protection Act (EPA), nonpoint source pollution is caused by rainfall or snowmelt moving over and through the ground, and includes excess fertilizers, herbicides, and insecticides from agricultural lands and residential areas; oil, grease and toxic chemicals from urban runoff and energy production; sediment from improperly managed construction sites, crop and forest land, and eroding stream banks; salt from irrigation practices

██ "Congress dealt with the problem of point source pollution using the National Pollution Discharge Elimination System [NPDES] permit process. Under this approach, compliance rests on technology-based controls that limit the discharge of pollution from any point source into certain waters unless that discharge complies with the [Clean Water] Act's specific requirements." (*San Francisco BayKeeper v. Whitman* (2002) 297 F.3d 877, 880; see 33 U.S.C. § 1311(b)(1)(A).) " 'Nonpoint sources, because of their very nature, are not regulated under the NPDES [program]. Instead, Congress addressed nonpoint sources of pollution in a separate portion of the [Clean Water] Act which encourages states to develop areawide waste treatment management plans.' " (*Pronsolino v. Marcus* (N.D.Cal. 2000) 91 F.Supp.2d 1337, 1348, citing 33 U.S.C. § 1288; see also 33 U.S.C. § 1329.)

"When the NPDES system fails to adequately clean up certain rivers, streams or smaller water segments, the [Clean Water] Act requires use of a water-quality based approach. States are required to identify such waters . . . [and] rank [them] in order of priority, and based on that ranking, calculate levels of permissible pollution called 'total maximum daily loads' or 'TMDLs.' " (*San Francisco BayKeeper v. Whitman, supra,* 297 F.3d at p. 880; see 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. § 130.7(b) (2003).) "This list of substandard waters is known as the '303(d) list' (section 303 of the Clean Water Act having been codified as [title 33 United States Code] section 1313)." (*City of Arcadia v. U.S. Environmental* (9th Cir. 2005) 411 F.3d 1103, 1105 (*City of Arcadia II*).)

"A TMDL defines the specified maximum amount of a pollutant which can be discharged or 'loaded' into the waters at issue from all combined sources." (*Dioxin/Organochlorine Center v. Clarke* (9th Cir. 1995) 57 F.3d 1517, 1520.) "A TMDL must be 'established at a level necessary to implement the applicable water quality standards . . . .' [Citation.] A TMDL assigns a *waste load allocation* . . . to each point source, which is that portion of the TMDL's total pollutant load, which is allocated to a point source for which an NPDES permit is required. [Citation.] Once a TMDL is developed, effluent limitations in NPDES permits must be consistent with the [waste load allocations] in the TMDL." (*Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1095–1096 [1 Cal.Rptr.3d 76]; see *Dioxin/Organochlorine Center v. Clarke,* at p. 1520.)[4] A TMDL requires a

---

and acid drainage from abandoned mines; and bacteria and nutrients from livestock, pet wastes and faulty septic systems. (<http://www.epa.gov/owow/nps/qa.html> [as of Jan. 26, 2006].)

[4] The Clean Water Act "does not define total maximum daily load. EPA's regulations break it into a 'waste[]load allocation' for point sources and a 'load allocation' for nonpoint sources." (*Pronsolino v. Marcus, supra,* 91 F.Supp.2d at p. 1344, fn. 8; see 40 C.F.R. § 130.2(g)–(i) (2005).)

"margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." (33 U.S.C. § 1313(d)(1)(C).)

The EPA may allow states to adopt and administer NPDES permit programs (*Pronsolino v. Marcus, supra,* 91 F.Supp.2d at p. 1347, fn. 10), and it has authorized California to administer such a program. (54 Fed.Reg. 40664 (Oct. 3, 1989).)

B

*State Law*

█ California implements the Clean Water Act through the Porter-Cologne Act (Wat. Code, § 13000 et seq.), which was promulgated in 1969. Under the Porter-Cologne Act, nine regional boards regulate the quality of waters within their regions under the purview of the State Board. (Wat. Code, §§ 13000, 13100, 13200, 13241, 13242.)

Regional boards must formulate and adopt water quality control plans, commonly called basin plans, which designate the beneficial uses to be protected, water quality objectives and a program to meet the objectives. (Wat. Code, §§ 13050, subd. (j), 13240.) " 'Water quality objectives' means the limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area." (*Id.,* § 13050, subd. (h).)

The EPA must approve or disapprove a state's TMDL within 30 days of its submission. (33 U.S.C. § 1313(d)(2).) If the EPA disapproves a state's submission, it must establish its own TMDL within 30 days of the disapproval. (*Ibid.*)

II

*Trash TMDL*

The Los Angeles River is a 51-mile flood control channel, largely concrete-lined, which runs through the City of Los Angeles and surrounding municipalities in Los Angeles County and terminates at the Pacific Ocean. In 1990 the Regional Board issued an NPDES storm water permit to the Los Angeles County Department of Public Works as the principal permittee and 84 cities as copermittees, to address various chemical pollutants discharged into the region's water bodies (Municipal NPDES Permit).

In 1994 the Regional Board adopted a revised water quality control plan, or basin plan (1994 Basin Plan), which includes narrative water quality objectives. It provides that "[w]aters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses," and "[w]aters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses." (Italics omitted.) Beneficial uses of the Los Angeles River and surrounds include wildlife and marine habitat, including habitat for endangered species, and recreational activities such as fishing, walking, hiking, jogging, bicycling, horseback riding, bird watching and photography.

In 1996 and 1998 the Regional Board identified certain reaches of the Los Angeles River on the state's "303(d) list" as being impaired by trash, primarily through storm water runoff in thousands of municipal storm drains.[5] On September 19, 2001, the Regional Board adopted a resolution to amend its 1994 Basin Plan to incorporate a TMDL for trash in the Los Angeles River (Trash TMDL). Despite many objections from affected municipalities, the Trash TMDL sets a numeric target of zero trash as "even a single piece of trash can be detrimental, and no level of trash is acceptable in waters of the state."[6] "The numeric target is staff's interpretation of the narrative water quality objective [in the 1994 Basin Plan], including an implicit margin of safety."

The reduction of trash is to be phased over a 14-year period, including an optional two-year baseline monitoring period. In lieu of baseline monitoring, cities may accept a default baseline allocation of "640 gallons of uncompressed trash per square mile per year," a value based on data the City of Calabasas provided. The Trash TMDL provides for a "review of the current target [of zero trash] . . . once a reduction of 50% has been achieved and sustained," "based on the findings of future studies regarding the threshold levels needed for protecting beneficial uses."

Under the Trash TMDL, cities may use a variety of compliance methods, including "[e]nd-of-pipe full capture structural controls," "partial capture

---

[5] The Regional Board defines "trash" as "man-made litter" within the meaning of Government Code section 68055.1, subdivision (g), which provides: " 'Litter' means all improperly discarded waste material, including, but not limited to, convenience food, beverage, and other produce packages or containers constructed of steel, aluminum, glass, paper, plastic, and other natural and synthetic materials, thrown or deposited on the lands and waters of the state, but not including the properly discarded waste of the primary processing of agriculture, mining, logging, sawmilling, or manufacturing."

[6] The Regional Board adopted a Trash TMDL in January 2001, which also had a target of zero trash. It reconsidered the matter on September 19, 2001, "to provide clarifying language and greater flexibility in implementing the [Trash] TMDL."

control systems" and "[i]nstitutional controls." Cities using a full-capture system meeting certain criteria will be deemed in compliance with the zero target if the systems are properly maintained and maintenance records are available for the Regional Board's inspection.

On December 21, 2001, the Regional Board issued an order under Water Code section 13267 to the County of Los Angeles and copermittees under the Municipal NPDES Permit to submit baseline monitoring plans by February 1, 2002, and to monitor trash in the Los Angeles River between January 2002 and December 2003, with a final report due February 2004.[7] The Regional Board intends to use resulting data to "refine" the default baseline waste load allocations in the Trash TMDL.

In February and July 2002, the State Board and the Office of Administrative Law, respectively, approved the Trash TMDL. In August 2002 the EPA approved it and announced it supersedes an interim TMDL for trash the EPA adopted in March 2002 as a result of a consent decree in litigation between environmental groups and the EPA. (*City of Arcadia I, supra*, 265 F.Supp.2d 1142, 1147.)[8]

III

*Procedural History*

The Cities are within the Regional Board's jurisdiction and are permittees under the 2001 Municipal NPDES Permit. In July 2002 the Cities filed a petition for writ of mandate and complaint for declaratory and injunctive relief against the Water Boards. They filed the action in the Los Angeles County Superior Court, but the parties stipulated to its transfer to the San Diego County Superior Court.

The second amended petition alleges numerous grounds on which the Trash TMDL violates the Clean Water Act or the Porter-Cologne Act, and the court adjudicated some issues in favor of each party. It found the

---

[7] In *City of Arcadia v. U.S. Environ. Protection Agency* (N.D.Cal. 2003) 265 F.Supp.2d 1142, 1156 (*City of Arcadia I*), the court noted the Los Angeles County Department of Public Works has assumed responsibility for the baseline monitoring burden for all municipalities to which the Trash TMDL applies. The Trash TMDL states that "[e]ach of the permittees and copermittees are responsible for monitoring land uses within their jurisdiction," but "monitoring responsibilities may be delegated to a third-party monitoring entity such as the [Department of Public Works]."

[8] In *City of Arcadia I, supra*, 265 F.Supp.2d at page 1153, the City of Arcadia and other cities unsuccessfully challenged the EPA's approval of the Trash TMDL on the ground it was unauthorized to do so after adopting its own TMDL. In *City of Arcadia II, supra*, 411 F.3d at pages 1106–1107, the court affirmed the lower court's dismissal of the case.

Water Boards improperly (1) failed to conduct an analysis of the Los Angeles River's assimilative capacity; (2) failed to conduct a cost-benefit analysis or consider economic factors under Water Code sections 13267 and 13241; (3) purported to apply the Trash TMDL to the Estuary even though it is not listed on the state's 1998 303(d) list as impaired; and (4) failed to prepare a required EIR or its functional equivalent under CEQA. The court issued a writ of mandate commanding the Water Boards to set aside the amendment to the 1994 Basin Plan and the Trash TMDL to the extent it was based on the above findings and to not take any further steps to implement it. The court denied the Water Boards' motion to vacate the judgment or grant a new trial, and judgment was entered on December 24, 2003.

The Cities later moved for an order that the prohibitory terms of the writ of mandate and judgment not be stayed on appeal. (Code Civ. Proc., § 1110b.) The court granted the motion, and further ordered that "to preserve the status quo and prevent injustice to [the Cities], the . . . implementation schedule and compliance dates, and all milestones contained in the [Trash TMDL] shall be tolled effective December 24, 2003, through and until a final determination has been rendered on the pending appeal." The Water Boards appealed that order, and in accordance with the parties' stipulation we consolidated it with the other appeals.

## DISCUSSION

### WATER BOARDS' APPEAL

### I

#### Standard of Review

■ The Water Boards contend a deferential standard of review applies to our review of their action under Code of Civil Procedure section 1085, nd the Cities claim an independent standard applies under Code of Civil Procedure section 1094.5. Code of Civil Procedure section 1094.5, the administrative mandamus statute, applies when "the writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal." (Code Civ. Proc., § 1094.5, subd. (a).) "Acts of an administrative agency that are quasi-legislative in nature, e.g., establishment of regulations to carry out a statutory policy or direction, are not reviewable by administrative mandamus." (8 Witkin, Cal. Procedure (4th ed. 1997) Extraordinary Writs, § 268, pp. 1067–1068.) Rather, review of a quasi-legislative action is limited to traditional mandamus. (*Id.* at p. 1068.)

■ The trial court correctly found this proceeding is for traditional mandamus because the Regional Board's adoption and the State Water Board's approval of the Trash TMDL was quasi-legislative. Under Code of Civil Procedure section 1085, " ' "review is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support, . . ." ' . . . [and] [t]he petitioner has the burden of proof to show that the decision is unreasonable or invalid as a matter of law. [Citation.] We review the record de novo except where the trial court made foundational factual findings, which are binding on appeal if supported by substantial evidence." (*Citizens for Improved Sorrento Access, Inc. v. City of San Diego* (2004) 118 Cal.App.4th 808, 814 [13 Cal.Rptr.3d 259], citations omitted.)

The Cities' reliance on Water Code section 13330 is misplaced. It provides that "[a]ny party aggrieved by a final decision or order of a regional board *for which the state board denies review* may obtain review of the decision or order of the regional board in the superior court" (*id.*, § 13330, subd. (b), italics added), and "[e]xcept as otherwise provided herein, Section 1094.5 of the Code of Civil Procedure shall govern proceedings for which petitions are filed pursuant to this section" (*id.*, § 13330, subd. (d)). Given the language italicized *ante*, Water Code section 13330 necessarily applies to an administrative appeal of a quasi-judicial action under Code of Civil Procedure section 1094.5. Here, an appeal to the State Board was unnecessary because the Trash TMDL was ineffective without its approval. (Wat. Code, § 13245.) Indeed, the State Board notified the Cities in March 2001 that it "lacks statutory authority to accept petitions for review of water quality control plan (basin plan) amendments adopted" by regional boards.

As to CEQA issues, the parties agree an abuse of discretion standard applies. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1199 [24 Cal.Rptr.3d 543].) Abuse of discretion "is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5.) "Our task on appeal is 'the same as the trial court's.' [Citation.] Thus, we conduct our review independent of the trial court's findings." (*Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1602, fn. 3 [35 Cal.Rptr.2d 470].)

## II

### *Assimilative Capacity Study*

The trial court invalidated the Trash TMDL based in part on the Cities' argument an "assimilative capacity study" is a required element of a TMDL and none was performed here. In its statement of decision, the court

explained "[i]t is unreasonable to conclude that the beneficial uses of the [Los Angeles] River could not be maintained with some 'target' other than zero. Of course, it is possible the River would not support a greater target, however, without a study it is yet undetermined."

The Water Boards contend the trial court erred by substituting its own judgment for that of the Water Boards on the issue of whether the adoption of the Trash TMDL should have been preceded by a scientific study of the assimilative capacity of the Los Angeles River. They assert the matter was best suited for their determination rather than the court's and the evidence adequately supports their decision. We agree with the Water Boards.

During the notice and comment period, the Regional Board received numerous complaints that a zero Trash TMDL is infeasible, or at least unwarranted without a scientific assimilative capacity study, or load capacity study, showing a zero limit is the only means of protecting beneficial uses. For instance, the City of Los Angeles worried that "[i]f there's one gum wrapper in the [Los Angeles] River, you can get sued."

The Regional Board responded to one complaint as follows: "For more typical pollutants, the loading parameters are flow and pollutant concentration. For this pollutant [trash], flow does not serve to dilute the pollutant, but merely serves as a transport mechanism. Therefore, the typical loading calculation does not apply to trash." The Regional Board took the position that since littering is unlawful, a target of zero trash in the Los Angeles River is the only defensible position. It also explained that its staff "found no study to document that there is an acceptable level of trash that will cause no harm to aquatic life," and absent such a study it was compelled to adopt a zero target.

At a Regional Board hearing, Dr. Mark Gold, executive director of Heal the Bay, testified he was unaware of any assimilative capacity study having been performed anywhere on trash. He explained, "Basically it's a physical object. It's trash. It's not something that breaks down and becomes part of the environment in many, many cases. And so honestly, it probably won't reach any sort of threshold of being a scientific study of any value."

At a State Board hearing Dave Smith, an EPA team leader working with the Regional Board on the trash issue, testified "it would be difficult to design [an assimilative capacity] study and come up with firm answers." He also explained that both the Regional Board and the State Board "have conducted pretty diligent efforts to find research studies, reports, that look at the affects of trash on the aquatic environment," and neither they nor the EPA could find any literature to support a target of more than zero trash.

Alex Helperin, of the Natural Resources Defense Council, testified at a Regional Board hearing that "[e]ven small quantities [of trash] can maim and kill wildlife, [which] becomes entangled in it or ingest[s] it. [Trash] [c]an obstruct and repel boaters and contract recreators and compromise the aesthetic quality that's essential to the recognized aspect of non-contact recreation beneficial use for the Los Angeles River."

The administrative record includes numerous photographs of copious amounts of trash deposited in the Los Angeles River watershed through storm water drains. Dennis Dickerson, the executive officer of the Regional Board, testified he took photographs of trash in the Long Beach area shortly after storms, and among them are photographs of "water birds foraging among the trash." One photograph is of a bird with a cigarette butt in its mouth and another is of a fish trapped in a plastic six-ring can holder.

In arguing an assimilative capacity study is required *before* adopting a TMDL, the Cities rely principally on an EPA document issued January 7, 2000, entitled "Guidance for Developing TMDLs in California" (2000 EPA Guidance). It states: "The TMDL document must describe the relationship between numeric target(s) and identified pollutant sources, and estimate total assimilative capacity (loading capacity) of the water[]body for the pollutant of concern . . . . [¶] The loading capacity is the critical quantitative link between the applicable water quality standards (as interpreted through numeric targets) and the TMDL. Thus, a maximum allowable pollutant load must be estimated to address the site-specific nature of the impairment. . . . [¶] The loading capacity section must discuss the methods and data used to estimate loading capacity. A range of methods can be used . . . ." (Boldface omitted.)

The 2000 EPA Guidance, however, contains the following disclaimer: "[I]t does not impose legally-binding requirements on the EPA, the State of California, or the regulated community, and may not apply to a particular situation based upon the circumstances. EPA and State decision makers retain the discretion to adopt approaches on a case-by-case basis that differ from this guidance where appropriate and consistent with the requirements of section 303(d) [of the Clean Water Act] and EPA's regulations."

 Smith, of the EPA, testified at a Regional Board hearing that he wrote the 2000 EPA Guidance and the Trash TMDL "fully complies with the Clean Water Act, its regulations and [the 2000 EPA Guidance]." Smith explained the "TMDL process specifically contemplates making decisions under uncertainty," and "[i]t does so by providing that a margin of safety has to be incorporated in every TMDL to account for the uncertainty in the analysis." Smith said states are required "to move forward to make TMDL decisions

based on available information and data, not to wait again and again and again for better information to come forward." Generally, " 'considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer.' " (*United States v. Mead Corp.* (2001) 533 U.S. 218, 227–228 [150 L.Ed.2d 292, 121 S.Ct. 2164].)

In *Natural Resources Defense Council v. Muszynski* (2d Cir. 2001) 268 F.3d 91 (*Muszynski*), the plaintiff asked the court to invalidate a TMDL that the EPA had approved to control phosphorus pollution in drinking water, on the ground a margin of safety of only 10 percent was insufficient to account for uncertainty regarding the effects of phosphorus on water quality. The plaintiff argued "that no scientific or mathematical basis prescribed this percentage as opposed to any other." (*Id.* at p. 102.) The EPA countered that "because 'there is no "standard" or guideline for choosing a specific margin of safety, best professional judgment and the available information are used in setting [it].' " (*Ibid.*) The *Muszynski* court agreed with the EPA, explaining: "While the [margin of safety] may . . . be set with an uncomfortable degree of discretion, requiring that EPA [or authorized regional board] show a rigorous scientific methodology *dictates one course of action as opposed to another and would effectively prevent the agency from acting in situations where action is required in the face of a clear public health or environmental danger but the magnitude of that danger cannot be effectively quantified.* '[A]s long as Congress delegates power to an agency to regulate on the borders of the unknown, courts cannot interfere with reasonable interpretations of equivocal evidence.' [Citation.] . . . [S]imply to reject EPA's efforts to implement the [Clean Water Act] because it must respond to real water quality problems without the guidance of a rigorously precise methodology would essentially nullify the exercise of agency discretion in the form of 'best professional judgment.' " (*Muszynski, supra,* 268 F.3d at pp. 102–103, italics added.)

Further, in *Muszynski, supra,* 268 F.3d 91, 103, the court noted "that approval of the Phase I [margin of safety] was based, in part, on the limited information available. The EPA approval contemplates revision of the [margin of safety] as more information becomes available: 'As additional reservoir data and loading data become available, Phase I model assumptions are being reexamined under Phase II.' "

We conclude federal law does not require the Regional Board to conduct an assimilative capacity study before adopting the Trash TMDL. Moreover, the evidence amply shows that because of the nature of trash, including Styrofoam containers and other materials that are undiluted by water, in contrast to chemical pollutants, and the dangers to wildlife of even small amounts of trash, an assimilative capacity study would be difficult to conduct and of little value at the outset. For instance, given the ill effects of trash in a

water body it is unlikely such a study would determine the Los Angeles River may be loaded with a certain percentage of trash without affecting beneficial uses, particularly since a TMDL must include a margin of safety that "takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." (33 U.S.C. § 1313(d)(1)(C).) In any event, the Trash TMDL requires the Regional Board to reconsider the zero trash target after a 50 percent reduction of trash is achieved, and no party suggests a trash reduction of at least 50 percent is unwarranted or unattainable. Because of this escape hatch, compliance with a zero trash target may never actually be mandated. The Water Boards' decision not to conduct or require an assimilative capacity study is within their expertise, not the court's, and we defer to them on the issue.

### III

### Cost-Benefit Analysis and Economic Considerations

The Water Boards next contend the court erred by finding the Trash TMDL is invalid because they violated state law by not conducting a cost-benefit analysis (Wat. Code, § 13267) or considering economic factors (*id.* at § 13241) before adopting and approving it.

### A

### Water Code Section 13267

A regional board is authorized to investigate the quality of waters in its region (Wat. Code, § 13267, subd. (a)), and when it requires a polluter to furnish "technical or monitoring program reports," the "burden, including costs, of these reports shall bear a reasonable relationship to the need for the report[s] and the benefits to be obtained from the reports." (Wat. Code, § 13267, subd. (b)(1).) The court found the Regional Board adopted the Trash TMDL under the authority of Water Code section 13267, as the document mentions the statute several times and "expressly requires monitoring plans and submission of data to establish baselines for trash discharges."

The Water Boards persuasively contend Water Code section 13267 is inapplicable, and references to that statute in the Trash TMDL are to contemplated future orders. For instance, the Trash TMDL states "[b]aseline monitoring will be required via [Water Code] Section 13267," and the submission of baseline monitoring plans will be due "30 days after receipt of the Executive Officer's request as authorized by [Water Code] Section 13267."

It also states that "future storm water permits will be modified to incorporate the Waste Load Allocations and to address monitoring and implementation of this [Trash] TMDL."

Further, the Trash TMDL states "the permittee [under the Municipal NPDES permit] will submit a monitoring plan with the proposed monitoring sites and at least two alternative monitoring locations for each site. The plan must include maps of the drainage and storm drain data for each proposed and alternate monitoring location. The monitoring plan(s) will be submitted to the Regional Board within 30 days after receipt of the Executive Officer's letter requesting such a plan. Such a request is authorized pursuant to [Water Code] [s]ection 13267. . . . The Regional Board's Executive Officer will have full authority to review the monitoring plan(s), to modify the plan, to select among the alternate monitoring sites, and to approve or disapprove the plan(s)."

Additionally, the Water Boards submit that the December 21, 2001 order the Regional Board issued under Water Code section 13267 to the County of Los Angeles and copermittees under the Municipal NPDES permit regarding baseline monitoring and reporting would have been "useless and unnecessary" had the Trash TMDL itself required monitoring and reporting, and since there was no appeal of the December 21 order to the State Board within 30 days (Wat. Code, § 13320, subd. (a)) the cost-benefit analysis issue is not subject to appellate review. We note that the December 21 order, but not the Trash TMDL, warns that under Water Code section 13268 the "failure to conduct the required monitoring and/or to provide the required information in a timely manner may result in civil liability imposed by the Regional Board in an amount not to exceed . . . $1000."

■ "Our primary aim in construing any law is to determine the legislative intent. [Citation.] In doing so we look first to the words of the statute, giving them their usual and ordinary meaning." (*Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 501 [247 Cal.Rptr. 362, 754 P.2d 708].) We agree that by its plain terms Water Code section 13267 is inapplicable at the TMDL stage, and thus the court erred by invalidating the Trash TMDL on this ground. The monitoring and reports are required by the December 21, 2001 order, not the Trash TMDL, and the reduction of trash will be implemented by other NPDES permits. "TMDLs are primarily informational tools that allow the states to proceed from the identification of waters requiring additional planning to the required plans." (*Pronsolino v. Nastri* (9th Cir. 2002) 291 F.3d 1123, 1129.) ■ "A TMDL does not, by itself, prohibit any conduct or require any actions. Instead, each TMDL represents a goal that may be implemented by adjusting pollutant discharge requirements in individual NPDES permits or establishing nonpoint source

controls." (*City of Arcadia I, supra,* 265 F.Supp.2d at p. 1144.) A "TMDL forms the basis for further administrative actions that may require or prohibit conduct with respect to particularized pollutant discharges and water[]bodies." (*Id.* at p. 1145.)

## B

### Water Code Section 13241

Water Code section 13241 provides that "[e]ach regional board shall establish such water quality objectives in water quality control plans as in its judgment will ensure the reasonable protection of beneficial uses and the prevention of nuisance." In establishing water quality objectives a regional board is required to consider several factors, including "[e]conomic considerations." (Wat. Code, § 13241, subd. (d).)

The Water Boards contend Water Code section 13241 is inapplicable because the Trash TMDL does not establish water quality objectives, but merely implements, under Water Code section 13242, the existing narrative water quality objectives in the 1994 Basin Plan. It provides that waters shall not contain floating materials, including solids, or suspended or settleable materials in concentrations that adversely affect beneficial uses. The Cities counter that the Trash TMDL effectively establishes new water quality objectives, because when the 1994 Basin Plan was adopted a TMDL for trash was not contemplated and thus economic considerations of such a TMDL were not considered. Further, the Trash TMDL imposes for the first time a numeric limit for trash and significantly increases the costs of compliance.

We need not, however, decide whether the Trash TMDL adopts new or revised water quality objectives within the meaning of Water Code section 13241, because even if the statute is applicable, the Water Boards sufficiently complied with it.[9] Water Code section 13241, subdivision (d) does not define "economic considerations" or specify a particular manner of compliance, and thus, as the Water Boards assert, the matter is within a regional board's discretion. It appears there is no reported opinion analyzing the "economic considerations" phrase of this statute. In *City of Burbank, supra,* 35 Cal.4th at page 625, the court, without discussion, concluded that in adopting Water Code section 13241 the Legislature intended "that a regional board consider the *cost of compliance* [with numeric pollutant restrictions] when setting effluent limitations in a wastewater discharge permit." (Italics added.)

---

[9] For the same reason, we are not required to reach the Water Boards' assertion that to any extent the California Supreme Court's recent opinion in *City of Burbank, supra,* 35 Cal.4th 613, applies to a TMDL, it precludes them from considering economic factors in establishing the Trash TMDL.

The Trash TMDL discusses the costs of gathering and disposing of trash at the mouth of the Los Angeles River watershed during the rainy seasons between 1995 and 1999. It also states: "Cleaning up the river, its tributaries and the beaches is a costly endeavor. The Los Angeles County Department of Public Works contracts out the cleaning of over 75,000 catchments (catch basins) for a total cost of slightly over $1 million per year, billed to 42 municipalities. . . . [¶] Over 4,000 tons of trash are collected from Los Angeles County beaches annually, at a cost of $3.6 million to Santa Monica Bay communities in fiscal years 1988–1989 alone. In 1994 the annual cost to clean the 31 miles of beaches (19 beaches) along Los Angeles County was $4,157,388."

The Trash TMDL also discusses the costs of various types of compliance measures, and explains the "cost of implementing this TMDL will range widely, depending on the method that the Permittees select to meet the Waste Load Allocations. Arguably, enforcement of existing litter ordinances could be used to achieve the final Waste Load Allocations at minimal or no additional cost. The most costly approach in the short-term is the installation of full-capture structural treatment devices on all discharges into the river. However, in the long term this approach would result in lower labor costs and may be less expensive than some other approaches."

The Trash TMDL defines catch basin inserts as "the least expensive structural treatment device in the short term," at a cost of approximately $800 each. It cautions, however, that because catch basin inserts "are not a full capture method, they must be monitored frequently and must be used in conjunction with frequent street sweeping." The Trash TMDL estimates that if the approximately 150,000 catch basins throughout the watershed were retrofitted with inserts, capital costs would be $120 million over 10 years, maintenance and operation costs would be $330 million over 10 years, and maintenance and operation costs after full implementation would be $60 million per year.

Further, the Trash TMDL discusses the full capture vortex separation system (VSS), which "diverts the incoming flow of storm[]water and pollutants into a pollutant separation and containment chamber. Solids within the separation chamber are kept in continuous motion, and are prevented from blocking the screen so that water can pass through the screen and flow downstream. This is a permanent device that can be retrofitted for oil separation as well. Studies have shown that VSS [units] remove virtually all of the trash contained in treated water. The cost of installing a VSS is assumed to be high, so limited funds will place a cap on the number of units which can be installed during any single fiscal year."

The Trash TMDL estimates the retrofitting of the entire Los Angeles River watershed with low capacity VSS units would be $945 million in capital costs and $813 million in operation and maintenance costs over 10 years, and $148 million in annual operation and maintenance costs after full implementation. The installation of large capacity VSS units would run approximately $332 million in capital costs and $41 million in operation and maintenance costs over 10 years, and $7.4 million per year in operation and maintenance costs after full implementation. The yearly cost of servicing one VSS unit is estimated to be $2,000. The Trash TMDL explains that "outfitting a large drainage with a number of large VSS [units] may be less costly than using a larger number of small VSS [units]. Maintenance costs decrease dramatically as the size of the system increases." The Trash TMDL also contains a cost comparison of catch basin inserts and low capacity and large capacity VSS units.

Additionally, the Trash TMDL estimates the costs for end-of-pipe nets at between $10,000 and $80,000, depending on the length of the pipe network. It explains that " '[r]elease nets' are a relatively economical way to monitor trash loads from municipal drainage systems. However, in general they can only be used to monitor or intercept trash at the end of a pipe and are considered to be partial capture systems, as nets are usually sized at a 1/2″ to 1″ mesh."

The Cities assert that "a 'consideration' of economics should have included a discussion of the economic *impacts* associated with the vortex separation systems. Alternatively, the Water Boards could have analyzed other methods of compliance, such as a series of [best management practices], including increased street sweeping, catch basin inserts, release nets, or some other combination of [best management practices] that should have been evaluated for purposes of allowing the municipalities to be in deemed compliance with the zero [Trash] TMDL." (Italics added.) As stated, though, the Trash TMDL does include the estimated costs of several types of compliance methods and a cost comparison of capital costs and costs of operation and maintenance. The Cities cite no authority for the proposition that a consideration of economic factors under Water Code section 13241 must include an analysis of every conceivable compliance method or combinations thereof or the fiscal impacts on permittees.

Given the lack of any definition for "economic considerations" as used in Water Code section 13241, and our deference to the Water Boards' expertise, we conclude the Trash TMDL's discussion of compliance costs is adequate

and does not fulfill the arbitrary or capricious standard. Accordingly, the Trash TMDL is not invalid on this ground.[10]

IV

*Los Angeles River Estuary*

Additionally, the Water Boards challenge the court's finding they abused their discretion by attempting to include the Estuary in the Trash TMDL, as the Estuary is not on the state's 1998 303(d) list of impaired waters. The Water Boards contend a water body's formal listing on the state's 303(d) list is not a prerequisite to formulating a TMDL for it. Rather, an agency may simultaneously submit to the EPA the *identification* of a water body as impaired and a corresponding TMDL.

The Clean Water Act provides: "Each state shall identify those waters within its boundaries for which the effluent limitations . . . are not stringent enough to implement any water quality standards applicable to such waters. The State shall establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters." (33 U.S.C. § 1313(d)(1)(A).) Further, it provides that "[e]ach state shall establish for the waters identified in paragraph (1)(A) of this subsection, and in accordance with the priority ranking, the total maximum daily load . . . ." (*Id.* at § 1313(d)(1)(C).) These provisions do not prohibit a regional board from identifying a water body and establishing a TMDL for it at essentially the same time, or indicate that formal designation on a state's 303(d) list is a prerequisite to a TMDL.

Further, 33 United States Code section 1313(d)(2) provides: "Each State shall submit to the [EPA] Administrator from time to time, . . . for his [or her] approval the waters identified *and* the loads established under paragraphs (1)(A) [and] . . . (1)(C) . . . of this subsection. The [EPA] Administrator shall either approve or disapprove such identification *and* load not later than thirty days after the date of submission." (Italics added.) This clarifies that a regional board may simultaneously identify an impaired water body and establish a TMDL for it.

---

[10] The Cities also assert that under federal law an economic analysis is a prerequisite to the adoption of a TMDL. They rely on 40 Code of Federal Regulations, part 130.6(c)(4), but it pertains to nonpoint sources of pollution that need not be addressed in a TMDL, as discussed further *post.* The portion of the regulation covering TMDL's does not mention economics (*id.,* § 130.6(c)(1)). Parts 130.6(5) and (6) of 40 Code of Federal Regulations discuss economics, but in the context of the area wide planning process under section 208(b)(2) of the Clean Water Act (33 U.S.C. § 1288(b)(2)), which is inapplicable here. According to the Water Boards, the Southern California Association of Governments is the designated area-wide planning agency.

In *San Francisco BayKeeper v. Whitman, supra*, 297 F.3d 877, 884–885, the court held an agency has no *duty* to submit a TMDL at the same time it identifies an impaired water body, noting the development of a TMDL "to correct the pollution is obviously a more intensive and time-consuming project than simply identifying the polluted waters, as the EPA has indicated." (*Id.* at p. 885.) The Water Boards assert the case does not deprive an agency from exercising its *discretion* to simultaneously submit to the EPA the identification of an impaired water body and a TMDL for it. Given the plain language of 33 United States Code section 1313(d)(2), we agree. Moreover, "[s]tates remain at the front line in combating pollution" (*City of Arcadia II, supra*, 411 F.3d at p. 1106), and "[s]o long as the [s]tate does not attempt to adopt more *lenient* pollution control measures than those already in place under the [Clean Water] Act, [it] does not prohibit state action." (*Id.* at p. 1107.)

Alternatively, the Cities complain the Regional Board did not sufficiently identify the Estuary as being impaired and included in the Trash TMDL until after its adoption and approval by the State Board and Office of Administrative Law and the completion of all public hearings. On July 29, 2002, the Regional Board sent the EPA a memorandum "to provide clarification on specific aspects" of the Trash TMDL. It stated that a "TMDL was established for the reaches of the Los Angeles River, tributaries and lakes listed on the [state's] 1998 303(d) list," and "[i]n addition, a TMDL was established for the Los Angeles River [E]stuary in the City of Long Beach. As described on page 12, paragraph 2 of the [staff] report, staff found that the impairment in the [E]stuary due to trash is 'even more acute in Long Beach where debris flushed down by the upper reaches collects.' [¶] The impairment in the [E]stuary was well documented during TMDL development," and it "would have been included in the 1998 303(d) list if the attached photographic evidence had been available at the time of the listing."

The Trash TMDL lists the reaches of the Los Angeles River "that are impaired by trash, and listed on the [state's] 303(d) list." The list does not include the Estuary. The Water Boards assert that even so, it was always obvious the Estuary is impaired and included in the Trash TMDL. The Trash TMDL states it is "for the Los Angeles River Watershed," and "watershed" is defined as "a region or area bounded peripherally by a divide and draining ultimately to a particular watercourse or body of water." (Merriam-Webster's Collegiate Dict. (10th ed. 1996) p. 1336.) "Estuary" is defined as "a water passage where the tide meets a river current," especially "an arm of the sea at the lower end of a river." (*Id.* at p. 397.)

The Trash TMDL describes the watershed as beginning at the "western end of the San Fernando Valley to the Queensway Bay and Pacific Ocean at Long Beach," and it also states the watershed continues from "Willow Street all

the way through the [E]stuary." An amici curiae brief by Santa Monica BayKeeper, Inc., Heal the Bay, Inc., and Natural Resources Defense Council, Inc. (collectively BayKeeper), asserts Queensway Bay is the site of the Estuary, and no party has challenged the assertion. Further, the Trash TMDL lists and discusses the beneficial uses of the Estuary, including habitat for many species of birds, some endangered, and fish. It also states beneficial uses "are impaired by large accumulations of suspended and settled debris throughout the river system," and in particular "estuarine habitat" is impaired. Further, the administrative record contains several pictures of trash deposited in the Estuary during high flows, depicting "the variety of ways through which trash . . . becomes an integral part of wildlife, affecting all plant and animal communities in the process."

The Trash TMDL's identification of the Estuary as impaired could have been clearer, but we conclude it was sufficient to put all affected parties on notice, and does not meet the arbitrary-and-capricious standard. Further, although the identification of impaired water bodies requires a priority ranking (33 U.S.C. § 1313(d)(2)), and the Trash TMDL does not prioritize the Estuary's need for a TMDL, we agree with amici curiae BayKeeper that any error in the Water Boards' procedure was not prejudicial because the Trash TMDL shows amelioration of the trash problem in the entire Los Angeles River watershed is highly important, and it is unlikely the Water Boards would single out the Estuary for lower priority or that inclusion of the Estuary would disturb their existing priorities.

V

*CEQA*

■ The Water Boards challenge the sufficiency of the evidence to support the trial court's finding that the amendment adding the Trash TMDL to the 1994 Basin Plan does not comport with CEQA. The court found the Regional Board's environmental checklist was deficient and there is sufficient evidence of a fair argument that the project may have a significant effect on the environment, thus necessitating an EIR or its functional equivalent. We conclude the court was correct.

A

*General Legal Principles*

■ "CEQA compels government first to identify the environmental effects of projects, and then to mitigate those adverse effects through the

imposition of feasible mitigation measures or through the selection of feasible alternatives." (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1233 [32 Cal.Rptr.2d 19, 876 P.2d 505].) CEQA mandates that public agencies refrain from approving projects with significant environmental effects if there are feasible alternatives or mitigation measures that can substantially lessen or avoid those effects. (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 134 [65 Cal.Rptr.2d 580, 939 P.2d 1280].)

CEQA is implemented through initial studies, negative declarations and EIR's. (*Sierra Club v. State Bd. of Forestry, supra,* 7 Cal.4th at p. 1229.) "CEQA requires a governmental agency [to] prepare an [EIR] whenever it considers approval of a proposed project that *'may* have a *significant* effect on the environment.' " (*Quail Botanical Gardens Foundation, Inc. v. City of Encinitas, supra,* 29 Cal.App.4th at p. 1601.) "If there is no substantial evidence a project 'may have a significant effect on the environment' or the initial study identifies potential significant effects, but provides for mitigation revisions which make such effects insignificant, a public agency must adopt a negative declaration to such effect and, as a result, no EIR is required. [Citations.] However, the Supreme Court has recognized that CEQA requires the preparation of an EIR 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citations.] Thus, if substantial evidence in the record supports a 'fair argument' significant impacts or effects may occur, an EIR is required and a negative declaration cannot be certified." (*Id.* at pp. 1601–1602.)

" 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to a physical change may be considered in determining whether the physical change is significant." (Cal. Code Regs., tit. 14, § 15382.)

B

*Certified Regulatory Program*

■ "State regulatory programs that meet certain environmental standards and are certified by the Secretary of the California Resources Agency are exempt from CEQA's requirements for preparation of EIRs, negative declarations, and initial studies. [Citations.] Environmental review documents prepared by certified programs may be used instead of environmental documents that CEQA would otherwise require. [Citations.] Certified regulatory

programs remain subject, however, to other CEQA requirements." (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2005) § 21.2, p. 1076; see Pub. Resources Code, § 21080.5.) Documents prepared by certified programs are considered the "functional equivalent" of documents CEQA would otherwise require. (*Mountain Lion Foundation v. Fish & Game Com., supra,* 16 Cal.4th at p. 113; 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra,* § 21.10, p. 1086 ["the documentation required of a certified program essentially duplicates" that required for an EIR or negative declaration].)

An "agency seeking certification must adopt regulations requiring that final action on the proposed activity include written responses to significant environmental points raised during the decisionmaking process. [Citation.] The agency must also implement guidelines for evaluating the proposed activity consistently with the environmental protection purposes of the regulatory program. [Citation.] The document generated pursuant to the agency's regulatory program must include alternatives to the proposed project and mitigation measures to minimize significant adverse environmental effects [citation], and be made available for review by other public agencies and the public [citation]." (*Mountain Lion Foundation v. Fish & Game Com., supra,* 16 Cal.4th at p. 127.)

■ The guidelines for implementation of CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.) do not directly apply to a certified regulatory program's environmental document. (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra,* § 21.10, p. 1086.) However, "[w]hen conducting its environmental review and preparing its documentation, a certified regulatory program is subject to the broad policy goals and substantive standards of CEQA." (*Ibid.*)

In a certified program, an environmental document used as a substitute for an EIR must include "[a]lternatives to the activity and mitigation measures to avoid or reduce any significant or potentially significant effects that the project might have on the environment," and a document used as a substitute negative declaration must include a "statement that the agency's review of the project showed that the project would not have any significant or potentially significant effects on the environment and therefore no alternatives or mitigation measures are proposed to avoid or reduce any significant effects on the environment. This statement shall be supported by a checklist or other documentation to show the possible effects that the agency examined in reaching this conclusion." (Cal. Code Regs., tit. 14, § 15252, subd. (a)(2)(A), (B).)

The basin planning process of the State Board and regional boards is a certified regulatory program (Cal. Code Regs., tit. 14, § 15251, subd. (g)), and

the regulations implementing the program appear in the California Code of Regulations, title 23, sections 3775 to 3782. A regional board's submission of a plan for State Board approval must be accompanied by a brief description of the proposed activity, a completed environmental checklist prescribed by the State Board, and a written report addressing reasonable alternatives to the proposed activity and mitigation measures to minimize any significant adverse environmental impacts. (*Id.*, § 3777, subd. (a).)

## C

### *Environmental Documentation*

The Regional Board's environmental documentation in lieu of documents CEQA ordinarily requires consists of a checklist and the Trash TMDL. The checklist asked a series of questions regarding whether implementation of the Trash TMDL would cause environmental impacts, to which the Regional Board responded "yes," "maybe" or "no." "Yes" or "maybe" answers required an explanation. The checklist described beneficial impacts pertaining to plant and animal life, water quality and recreation. The checklist denied the project would have any environmental impact on land, including soil displacement, air, noise, natural resources or traffic, and thus it included no discussion of those factors. The checklist concluded "the proposed Basin Plan amendment [adding the Trash TMDL] could not have a significant effect on the environment."

The Regional Board obviously intended its documentation to be the functional equivalent of a negative declaration. Nonetheless, on appeal the Water Boards claim for the first time that the Regional Board's environmental review process is tiered, and its documentation meets the requirements of a first tier EIR under Public Resources Code section 21159. They assert the court's criticism of the checklist is baseless "because it ignores the concept of tiered environmental review and specific provisions for pollution control performance standards."

" 'Tiering' refers 'to the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs or ultimately *site-specific* EIRs incorporating by reference the general discussions and concentrating solely on the issues specific to the EIR subsequently prepared. Tiering is appropriate when the sequence of EIRs is: [¶] . . . [f]rom a general plan, policy, or program EIR to a . . . site-specific EIR.' " (*Natural Resources Defense Council, Inc. v. City of Los Angeles* (2002) 103 Cal.App.4th 268, 285 [126 Cal.Rptr.2d 615].) "[C]ourts have allowed first tier EIR's to defer detailed analysis to subsequent project EIR's." (*Friends of*

*Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 532 [98 Cal.Rptr.2d 334].)

 Public Resources Code section 21159, which allows expedited environmental review for mandated projects, provides that an agency "shall perform, at the time of the adoption of a rule or regulation requiring the installation of pollution control equipment, or a performance standard or treatment requirement, an environmental analysis of the reasonably foreseeable methods of compliance. . . . The environmental analysis shall, at [a] minimum, include, all of the following: [¶] (1) An analysis of the reasonably foreseeable environmental impacts of the methods of compliance. [¶] (2) An analysis of reasonably foreseeable mitigation measures. [¶] (3) An analysis of reasonably foreseeable alternative means of compliance with the rule or regulation." (Pub. Resources Code, § 21159, subd. (a).) The Water Boards submit they complied with the statute, and the "tier two environmental review is the responsibility of the local agencies who will determine how they intend to comply with the performance standards" of the Trash TMDL.

Issues not presented to the trial court are ordinarily waived on appeal. (*Royster v. Montanez* (1982) 134 Cal.App.3d 362, 367 [184 Cal.Rptr. 560].) In any event, we conclude the checklist and Trash TMDL are insufficient as either the functional equivalent of a negative declaration[11] or a tiered EIR. Moreover, an EIR is required since the Trash TMDL itself presents substantial evidence of a fair argument that significant environmental impacts may occur. "Because a negative declaration ends environmental review, the fair argument test provides a low threshold for requiring an EIR." (*Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 399 [10 Cal.Rptr.3d 451].)

The Trash TMDL discusses various compliance methods or combinations thereof that permittees may employ, including the installation of catch basin inserts and VSS units. The Trash TMDL estimates that if the catch basin method is used exclusively, approximately 150,000 catch basins throughout the watershed would require retrofitting at a cost of approximately $120 million. It explains, however, that the "ideal way to capture trash deposited into a storm[]drain system would be to install a VSS unit. This device diverts

---

[11] A negative declaration may not be based on a " 'bare bones' " approach in a checklist. (*Snarled Traffic Obstructs Progress v. City and County of San Francisco* (1999) 74 Cal.App.4th 793, 797, fn. 2 [88 Cal.Rptr.2d 455], and cases cited therein.) A "certified program's statement of no significant impact must be supported by documentation *showing* the potential environmental impacts that the agency examined in reaching its conclusions," and "[t]his documentation would be similar to an initial study." (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 21.11, pp. 1088–1089, italics added.) Because we conclude an EIR is required, we need not expand on how the checklist and Trash TMDL fail to satisfy negative declaration requirements or their functional equivalent.

the incoming flow of storm[]water and pollutants into a pollution separation and containment chamber." Only VSS units or similar full-capture devices will be deemed fully compliant with the zero trash target. The Trash TMDL estimates the cost of installing low capacity VSS units would be $945 million and the cost of installing large capacity VSS units would be $332 million.

The checklist and the Trash TMDL, however, ignore the temporary impacts of the construction of these pollution controls, which logically may result in soils disruptions and displacements, an increase in noise levels and changes in traffic circulation. Further, the Trash TMDL explains that since catch basin inserts "are not a full capture method, they must be monitored frequently and must be used in conjunction with frequent street sweeping." The checklist and the Trash TMDL also ignore the effects of increased street sweeping on air quality, and possible impacts caused by maintenance of catch basin inserts, VSS units and other compliance methods.

Indeed, the County of Los Angeles wrote to the Regional Board that "cleanout of structural controls, such as [catch basin inserts] and VSSs, naturally will increase existing noise levels due to vehicle and vacuuming noises." The City of Los Angeles advised that the Trash TMDL would result in increased maintenance vehicle traffic and "substantial air emissions or deterioration of ambient air quality," increased noise, increased use of natural resources and adverse impacts on existing transportation systems.

The Water Boards contend those comments are merely "unsubstantiated opinion and speculation by biased project opponents." Substantial evidence is not "[a]rgument, speculation, unsubstantiated opinion or narrative [or] evidence which is clearly inaccurate or erroneous." (Pub. Resources Code, § 21082.2, subd. (c).) However, letters and testimony from government officials with personal knowledge of the anticipated effects of a project on their communities "certainly supports a fair argument that the project may have a significant environmental impact." (*City of Livermore v. Local Agency Formation Com.* (1986) 184 Cal.App.3d 531, 542 [230 Cal.Rptr. 867].) Again, however, the Trash TMDL itself satisfies the fair argument criterion.

Even if the Water Boards had relied on Public Resources Code section 21159 at the trial court, the environmental documents do not meet its minimum requirements. Neither the checklist nor the Trash TMDL includes an analysis of the reasonably foreseeable impacts of construction and maintenance of pollution control devices or mitigation measures, and in fact the Water Boards develop no argument as to how they ostensibly complied with the statute. While we agree a tiered environmental analysis is appropriate here, the Regional Board did not prepare a first-level EIR or its functional equivalent. We reject the Water Boards' argument the Regional Board did all it

could because there "is no way to examine project level impacts that are entirely dependent upon the speculative possibilities of how subsequent decision[]makers may choose to comply" with the Trash TMDL. Tier two project-specific EIR's would be more detailed under Public Resources Code section 21159.2, but the Trash TMDL sets forth various compliance methods, the general impacts of which are reasonably foreseeable but not discussed.

As a matter of policy, in CEQA cases a public agency must explain the reasons for its actions to afford the public and other agencies a meaningful opportunity to participate in the environmental review process, and to hold it accountable for its actions. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles, supra,* 126 Cal.App.4th 1180, 1198.) The Water Boards' CEQA documentation is inadequate, and remand is necessary for the preparation of an EIR or tiered EIR, or functional equivalent, as substantial evidence raises a fair argument the Trash TMDL may have significant impacts on the environment. The court correctly invalidated the Trash TMDL on CEQA grounds.[12]

## VI

### *Declaratory Relief*

In its statement of decision, the trial court explained the Cities "contend [the Water Boards] improperly attempted to control the watershed including the 'entire 584 square miles' of incorporated and unincorporated areas of the County [of Los Angeles], and nowhere in the [Trash] TMDL or the [1994] Basin Plan Amendment did [they] assert that the numeric Waste Load Allocations . . . are to apply to the entire 584 square miles of watershed." The court, however, explained the Water Boards "concede the [Trash] TMDL only applies to navigable waters by asserting [they] didn't intend to control non-navigable waters," and it found "the parties are in agreement that the trash load allocations apply to the portion of the subject watershed as defined on pages 3575 and 3584 of the Administrative Record [pages of the Trash TMDL] and the Waste Load Allocations do not apply to non-waters."

The statement of decision nonetheless states the court granted the Cities' "relief as requested" as to "regulation of non-waters." In their third cause of action, the Cities sought a judicial declaration that the amendment to the 1994 Basin Plan and the Trash TMDL are invalid because they violate federal and state law. The judgment declared unenforceable a July 29, 2002, letter from

---

[12] The Water Boards also contend the trial court erred by staying the implementation schedule for the Trash TMDL pending this appeal. The matter is moot given our holding on the CEQA issue.

the Regional Board to the EPA that stated the "Waste Load Allocations apply to the entire urbanized portion of the watershed . . . . The urbanized portion of the watershed was calculated to encompass 584 square miles of the total watershed."

■ "The fundamental basis of declaratory relief is the existence of an *actual, present controversy.*" (5 Witkin, Cal. Procedure, *supra,* Pleadings, § 817, p. 273.) Because the parties agreed during this proceeding there was no *present* controversy, the judgment should not have included declaratory relief on the nonwaters issue.

### *CITIES' APPEAL*

### I

### *Concepts of "Maximum Extent Practicable" and "Best Management Practices"*

■ The Cities contend a zero target for trash in the Los Angeles River is unattainable, and thus the Trash TMDL violates the law by not deeming compliance through the federal "maximum extent practicable" and "best management practices" standards, which are less stringent than the numeric target of zero. The Cities rely on 33 United States Code section 1342(p)(3)(B)(iii), under which an NPDES permit for a municipal discharge into a storm drain "shall require controls to reduce the discharge of pollutants to the *maximum extent practicable,* including management practices, control techniques and system, design and engineering methods, and such other provisions as the [EPA] Administrator or the State determines appropriate for the control of such pollutants." (Italics added.)[13] "Best management practices" are generally pollution control measures set forth in NPDES permits. (*BIA, supra,* 124 Cal.App.4th at p. 877.)

The Cities assert that "as the [r]ecord reflects, compliance with the 'zero' [Trash] TMDL . . . is impossible," and the Water Boards "themselves recognize that 'zero' is an impossible standard to meet." Contrary to the Cities' suggestion, the Water Boards made no implied finding or concession of impossibility. Rather, the record shows that members of the Water Boards questioned whether a zero trash target is actually attainable. A zero limit on

---

[13] The Clean Water Act and applicable regulations do not define the maximum extend practicable standard. (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 889 [22 Cal.Rptr.3d 128] (*BIA*).) In *BIA,* the NPDES permit at issue defined the standard as "a highly flexible concept that depends on balancing numerous factors." (*Ibid.*)

trash within the meaning of the Trash TMDL *is* attainable because there are methods of deemed compliance with the limit. The record does not show the limit is unattainable, and the burden was on the Cities as opponents of the Trash TMDL to establish impossibility. Further, the impossibility issue is not germane at this juncture, as the matter is at the planning stage with an interim goal of a 50 percent reduction in trash, a goal everyone agrees is necessary and achievable.

In any event, the trial court found 33 United States Code section 1342(p)(3)(B)(iii) inapplicable to the adoption of a TMDL. The court also found state and federal laws authorize regional boards to "use water quality, and not be limited to practicability as the guiding principle for developing limits [in a TMDL] on pollution." Further, the court noted the Cities presented no authority for their proposition the Regional Board is required to adopt a storm water TMDL that is achievable.

 We agree with the court's assessment. The statute applicable to establishing a TMDL, 33 United States Code section 1313(d)(1)(C), does not suggest that practicality is a consideration. To the contrary, a regional board is required to establish a TMDL "at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety." (33 U.S.C. § 1313(d)(1)(C).) The NPDES permit provision, 33 United States Code 1342(p)(3)(B), is inapplicable because, again, we are only considering the propriety of the Trash TMDL, a precursor to NPDES permits implementing it. Under the Trash TMDL, the numeric target will be reconsidered after several years when a reduction in trash of 50 percent is achieved, and thus it is presently unknown whether compliance with a trash limit of zero will ever actually be mandated.

 To bolster their position the Cities rely on 33 United States Code section 1329(a)(1)(C)). It provides, however, that in a state's assessment report for a *nonpoint* source management program, the state must "describe[] the process, including intergovernmental coordination and public participation, for identifying best management practices and measures to control each category and subcategory of nonpoint sources and, where appropriate, particular nonpoint sources identified under subparagraph (B) and to reduce, to the maximum extent practicable, the level of pollution resulting from such category, subcategory, or source." (*Ibid.*) In *BIA, supra,* 124 Cal.App.4th at page 887, we rejected the argument the statute shows Congress intended to apply a maximum extent practicable standard to point source discharges as well as nonpoint discharges. The Cities say they disagree with *BIA,* but they develop no argument revealing any flaw in the opinion. "[P]arties are required

to include argument and citation to authority in their briefs, and the absence of these necessary elements allows this court to treat appellant's . . . issue as waived." (*Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445, 1448 [37 Cal.Rptr.2d 126].)

The Cities' reliance on *Defenders of Wildlife v. Browner* (9th Cir. 1999) 191 F.3d 1159, for the proposition that municipalities, unlike private companies, may not be required to strictly comply with numeric discharge limits is likewise misplaced. *Defenders of Wildlife v. Browner* involves a challenge to an NPDES permit, not the adoption of a TMDL. Further, the court there rejected the argument that "the EPA [or authorized regional or state board] may not, under the [Clean Water Act], require strict compliance with state water-quality standards, through numerical limits or otherwise." (*Id.* at p. 1166.) The court explained: "Although Congress did not require municipal storm-sewer discharges to comply strictly with [numerical effluent limitations], [section] 1342(p)(3)(B)(iii) [of United States Code, title 33] states that '[p]ermits for discharges from municipal storm sewers . . . shall require . . . *such other provisions as the [EPA] Administrator . . . determines appropriate for the control of such pollutants.*' (Emphasis added.) That provision gives the EPA discretion to determine what pollution controls are appropriate. . . . [¶] Under that discretionary provision, the EPA has the authority to determine that ensuring strict compliance with state water-quality standards is necessary to control pollutants. The EPA also has the authority to require less than strict compliance with state water-quality standards. . . . Under 33 [United States Code section] 1342(p)(3)(B)(iii), the EPA's choice to include either management practices or numeric limitations in the permits was within its discretion." (*Id.* at pp. 1166–1167.)

In *BIA,* this court similarly held that 33 United States Code section 1342(p)(3)(B)(iii) does not divest a regional board's discretion to impose an NPDES permit condition requiring compliance with state water quality standards more stringent than the maximum-extent-practicable standard. (*BIA, supra,* 124 Cal.App.4th at pp. 871, 882–885; see also Wat. Code, § 13377 [waste discharge requirements shall meet federal standards and may also include "more stringent effluent standards or limitations necessary to implement water quality control plans, or for the protection of beneficial uses, or to prevent nuisance"].) Thus, even if the analysis in *Defenders of Wildlife v. Browner* or *BIA* arguably has any application to a TMDL, the opinions do not help the Cities.

 Additionally, the Cities' reliance on a November 2002 EPA memorandum on establishing TMDL's and issuing NPDES permits is misplaced, as it postdates the Regional Board's adoption of the Trash TMDL and its approval by the State Board and the EPA. Further, the memorandum states it

is not binding, and "indeed, there may be other approaches that would be appropriate in particular situations. When EPA makes a TMDL or permitting decision, it will make each decision on a case-by-case basis and will be guided by applicable requirements of the [Clean Water Act] and implementing regulations, taking into account comments and information presented at that time by interested persons regarding the appropriateness of applying these recommendations to the particular situation."

## II

### *Nonpoint Sources of Pollution*

The Cities contend the court should have invalidated the Trash TMDL on additional grounds, including the Water Boards' failure to identify load allocations and implementation measures for nonpoint sources of trash discharge. The Cities assert the Water Boards are required to adopt implementation measures "for the homeless and aerial sources of trash, [and] also for the other nonpoint sources of trash consisting of State and federal facilities, and other facilities not yet subject to NPDES Permits." The Cities submit that the Clean Water Act does not allow the Water Boards "to effectively impose the burden of the load allocation from all nonpoint sources solely on municipalities."

The Cities further claim the Water Boards acted arbitrarily and capriciously by imposing a trash target of zero on municipalities, but imposing a " 'de minimus' requirement on non-point source discharges." The Cities cite the July 29, 2002, letter from the Regional Board to the EPA, clarifying that it identified nonpoint sources of trash pollution "as wind blown trash and direct deposit of trash into the water," but "as the non-point sources were determined to be de-minimus, we did not believe it necessary to outline a reduction schedule for non-point sources." Contrary to the Cities' position, the Regional Board did not adopt a "de minimus" load allocation for nonpoint sources. Rather, as the trial court found, the Regional Board found the trash pollution from nonpoint sources *is de minimus* compared to trash pollution from point sources. The TMDL states the "major source of trash in the [Los Angeles River] results from litter, which is intentionally or accidentally discarded in the watershed drainage areas."

In arguing the Trash TMDL is required to include a specific load allocation for nonpoint sources of pollution, the Cities rely on the 2000 EPA Guidance, which provides: "Load allocations for nonpoint sources *may* be expressed as specific allocations for specific discharges or as 'gross allotments' to nonpoint source discharger categories. Separate nonpoint source allocations *should* be established for background loadings. Allocations may be based on a variety

of technical, economic, and political factors. The methodology used to set allocations *should* be discussed in detail." (Italics added.)

The 2000 EPA Guidance, however, states it does not impose legally binding requirements. Further, the load allocation for nonpoint sources is implicitly zero for trash. Federal regulations define a TMDL as the sum of waste load allocations for point sources, load allocations for nonpoint sources and natural backgrounds. (40 C.F.R. § 130.2(i) (2003).) Since "[a] TMDL defines the specified maximum amount of a pollutant which can be discharged into a body of water from all sources combined" (*American Wildlands v. Browner* (10th Cir. 2001) 260 F.3d 1192, 1194), and the Trash TMDL specifies a zero numeric target for trash in Los Angeles River, load allocations are necessarily zero as well as waste load allocations.

Additionally, the Cities cite no authority for the proposition the Water Boards are required to identify an implementation program for nonpoint pollution sources. Again, "[w]here a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion." (*People v. Ham* (1970) 7 Cal.App.3d 768, 783 [86 Cal.Rptr. 906], disapproved on another ground in *People v. Compton* (1971) 6 Cal.3d 55, 60, fn. 3 [98 Cal.Rptr. 217, 490 P.2d 537]; see *People v. Sierra* (1995) 37 Cal.App.4th 1690, 1693, fn. 2 [44 Cal.Rptr.2d 575].)

In any event, although the Clean Water Act focuses on both point and nonpoint sources of pollution, it is settled that the measure "does not require states to take regulator[y] action to limit the amount of non-point water pollution introduced into its waterways. While the [Clean Water Act] requires states to designate water standards and identify bodies of water that fail to meet these standards, ' "nothing in the [Clean Water Act] demands that a state adopt a regulatory system for nonpoint sources." ' " (*Defenders of Wildlife v. U.S. Environ. Protec., supra,* 415 F.3d at pp. 1124–1125, citing *American Wildlands v. Browner, supra,* 260 F.3d 1192, 1197 ["In the [Clean Water] Act, Congress has chosen not to give the EPA the authority to regulate nonpoint source pollution"]; *Appalachian Power Co. v. Train* (4th Cir. 1976) 545 F.2d 1351, 1373 ["Congress consciously distinguished between point source and nonpoint source discharges, giving EPA authority under the [Clean Water] Act to regulate only the former"]; *City of Arcadia I, supra,* 265 F.Supp.2d at p. 1145 ["For nonpoint sources, limitations on loadings are not subject to a federal nonpoint source permitting program, and therefore any nonpoint source reductions can be enforced . . . only to the extent that a state institutes such reductions as regulatory requirements pursuant to state

authority"].) "Nonpoint sources, because of their very nature, are not regulated under the NPDES [program]. Instead, Congress addressed nonpoint sources of pollution in a separate portion of the [Clean Water] Act which encourages states to develop areawide waste treatment management plans." (*Pronsolino v. Marcus, supra,* 91 F.Supp.2d at p. 1348, citing 33 U.S.C. § 1288; see also 33 U.S.C. § 1329.)

We conclude the court correctly ruled on this issue.

III

*Uses To Be Made of Watershed*

The Cities next contend the Trash TMDL is invalid because the Water Boards "improperly relied on nonexistent, illegal and irrational 'uses to be made' of the [Los Angeles] River." (Boldface and some capitalization omitted.) The Cities complain that the Trash TMDL states a purported beneficial use of one of numerous reaches of the river on the state's 303(d) list is "recreation and bathing, in particular by homeless people who seek shelter there," and the State Board chairman questioned the legality of such uses. The Cities also assert there is no evidence to support the Trash TMDL's finding that swimming is an actual use of the river in any location.

The Cities rely on section 303(d)(1)(A) of the Clean Water Act (33 U.S.C. § 1313(d)(1)(A)), which provides that in identifying impaired waters for its 303(d) list, states "shall establish a priority ranking for such waters, taking into account the severity of the pollution and the *uses to be made* of such waters." (Italics added.) The Cities assert "an 'illegal' use cannot be a 'use to be made' for the water body."

Additionally, the Cities cite Water Code section 13241, which requires regional boards to establish water quality objectives in water quality control plans by considering a variety of factors, including "[p]ast, present, and probable future beneficial uses of water." (Wat. Code, § 13241, subd. (a).) They assert the "Water Boards acted contrary to law by basing the [Trash] TMDL on any uses of the [Los Angeles] River other than the actual 'uses to be made' of the River." (Boldface omitted.)

The Cities, however, make no showing of prejudice. Swimming and bathing by the homeless are only two among numerous other beneficial uses that the Cities do not challenge, and there is no suggestion the numeric target of zero trash in the Los Angeles River would have been less stringent without consideration of the factors the Cities raise.

IV

*Scientific Methodology*

Further, the Cities contend the Trash TMDL is invalid on the additional ground that before adopting and approving it the Water Boards failed to comply with the requisite data collection and analysis. The Cities rely on a federal regulation providing that "[s]tates must establish appropriate monitoring methods and procedures (including biological monitoring) necessary to compile and analyze data on the quality of waters of the United States and, to the extent practicable, ground-waters." (40 C.F.R. § 130.4(a) (2003).) "The State's water monitoring program shall include collection and analysis of physical, chemical and biological data and quality assurance and control programs to assure scientifically valid data" in developing, among other things, TMDL's. (*Id.*, § 130.4(b).)

The trial court rejected the Cities' position, finding they failed to establish the Water Boards' scientific data is inadequate or scientifically invalid. The court explained the Water Boards "have not failed to conduct ongoing studies, as they say, how else would [they] know the River is impaired by trash[?] And the Record reveals studies relied upon by the Boards."

This argument is a variation on the assimilative capacity study issue, and we similarly reject it. As the Water Boards point out, "trash is different than other pollutants. . . . The complex modeling and analytical effort that may be necessary for typical pollutants that may be present in extremely low concentrations have no relevance to calculating a trash TMDL." Further, the Trash TMDL does discuss sources of trash in the Los Angeles River. It states the "City of Los Angeles conducted an Enhanced Catch Basin Cleaning Project in compliance with a consent decree between the [EPA], the State of California, and the City of Los Angeles. The project goals were to determine debris loading rates, characterize the debris, and find an optimal cleaning schedule through enhancing basin cleaning. The project evaluated trash loading at two drainage basins[.]" It goes on to discuss the amounts and types of trash collected in the drainage basins between March 1992 and December 1994. The Cities cite no authority for the notion the Water Boards may not rely on data collected by another entity.

The Trash TMDL also states "[s]everal studies conclude that urban runoff is the dominant source of trash. The large amounts of trash conveyed by the urban storm water to the Los Angeles River is evidenced by the amount of . . . trash that accumulates at the base of storm drains."

Alternatively, the Cities contend a TMDL is not suitable for trash calculation. They rely on 33 United States Code section 1313(d)(1)(C), which provides: "Each State shall establish for [impaired] waters . . . the total maximum daily load, for those pollutants which the [EPA] Administrator identifies . . . as *suitable for such calculation*. Such load shall be established at a level *necessary* to implement the applicable water quality standards with seasonal variations and a margin of safety." (Italics added.)

The Cities also cite a 1978 EPA regulation that states a TMDL is "suitable for . . . calculation" only under "proper technical conditions." (43 Fed.Reg. 60662, 60665 (Dec. 28, 1978) (italics omitted).) "Proper technical conditions" require "the availability of the analytical methods, modeling techniques and data base necessary to develop a technically defensible TMDL." (*Id.* at p. 60662.) The Cities assert the proper technical conditions do not exist, referring to the Trash TMDL's comment that "[e]xtensive research has not been done on trash generation or the precise relationship between rainfall and its deposition in waterways."

The Cities ignore the EPA's determination that a TMDL *may* be calculated for trash as a pollutant. It approved the Regional Board's Trash TMDL, and had previously approved a trash TMDL for the East Fork of the San Gabriel River. (See Cal. Code Regs., tit. 23, § 3933.) Thus, the Cities' view that the 1978 EPA regulation prohibits a TMDL for trash is unfounded. TMDL's for trash are relatively new, and there is no evidence that in 1978 the EPA contemplated their establishment.

We find irrelevant the Cities' discussion of the EPA's proposed July 2000 TMDL "rule," as their federal register citation is not a regulation and merely concerns the 2003 withdrawal of a rule that never took effect. (68 Fed.Reg. 13608, 13609 (Mar. 19, 2003) ["The July 2000 rule was controversial from the outset"].) In August 2001 the EPA delayed implementation of the July 2000 rule for further consideration, noting that some local government officials argued "some pollutants are not suitable for TMDL calculation." (66 Fed.Reg. 41817, 41819 (Aug. 9, 2001).) Nothing is said, however, about whether a trash TMDL is unsuitable for calculation, and again, the EPA has approved such TMDL's. The withdrawal of the proposed July 2000 rule left the existing rule regarding the establishment of a TMDL in place. (33 U.S.C. § 1313(d)(1)(C).)

V

*APA Requirements*

Lastly, the Cities contend the trial court erred by finding the Water Boards did not violate the APA. They assert the July 29, 2002, "clarification

memorandum" from the Regional Board to the EPA makes substantive changes to the Trash TMDL regulation-the inclusion of the Estuary in the Trash TMDL and designating an allocation of zero for nonpoint pollution sources-violates the notice and hearing provisions of the APA. The Cities also contend the Trash TMDL and the clarification memorandum "establish[] a regulation in violation of the APA's elements of 'clarity,' 'consistency,' and 'necessity,' as defined in [Government] Code section 11349."

The APA (Gov. Code, §§ 11340 et seq., 11370) "establishes the procedures by which state agencies may adopt regulations. The agency must give the public notice of its proposed regulatory action [citations]; issue a complete text of the proposed regulation with a statement of the reasons for it [citation]; give interested parties an opportunity to comment on the proposed regulation [citation]; respond in writing to public comments [citations]; and forward a file of all materials on which the agency relied in the regulatory process to the Office of Administrative Law [citation], which reviews the regulation for consistency with the law, clarity, and necessity [citations]." (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 568 [59 Cal.Rptr.2d 186, 927 P.2d 296].) "One purpose of the APA is to ensure that those persons or entities whom a regulation will affect have a voice in its creation [citation], as well as notice of the law's requirements so that they can conform their conduct accordingly [citation]." (*Id.* at pp. 568–569.)

The APA does not apply to "the adoption or revision of state policy for water quality control" unless the agency adopts a "policy, plan, or guideline, or any revision thereof." (Gov. Code, § 11353, subds. (a), (b)(1).) The Water Boards contend that while the Trash TMDL and amendment adding it to the 1994 Basin Plan are policies or plans covered by the APA, the clarification memorandum is not because it does not revise the terms of the Trash TMDL.

We are not required to reach the issue, because assuming the APA is applicable the Cities' position lacks merit. As to the Estuary, we have determined the Trash TMDL sufficiently notified affected parties of its inclusion in the document as an impaired water body. Further, we have determined the load allocation for nonpoint sources of trash pollution is also necessarily zero, and the Trash TMDL is not required to include implementation measures for nonpoint sources. Accordingly, the clarification memorandum is not germane.[14]

---

[14] We deny the Water Boards' June 16, 2005, request for judicial notice.

## DISPOSITION

The judgment is affirmed insofar as it is based on the Trash TMDL's violation of CEQA, and on a rejection of each of the issues the Cities raised in their appeal. The judgment is reversed insofar as it is based on the Trash TMDL's lack of an assimilative capacity study, inclusion of the Estuary as an impaired water body, and a cost-benefit analysis under Water Code section 13267 or the consideration of economic factors under Water Code section 13241, and also insofar as it grants declaratory relief regarding the purported inclusion of nonnavigable waters in the Trash TMDL.

The court's postjudgment order staying the Trash TMDL's implementation schedule is affirmed. The parties are to bear their own costs on appeal.

McIntyre, J., and Irion, J., concurred.

A petition for a rehearing was denied January 17, 2006, and the petition of plaintiffs and appellants for review by the Supreme Court was denied April 19, 2006, S141673.